**BUCKEYE SUGARS, INC.,**
**Plaintiff-Appellant,**

v.

**COMMODITY CREDIT CORPORATION,**
**Defendant-Appellee.**

**No. 83–3489.**

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1984.

Decided Oct. 3, 1984.

Ralph E. Dill (argued), Gurvis, Kauffman, Kurgis & Dill, Columbus, Ohio, for plaintiff-appellant.

Frederick H. McDonald, Asst. U.S. Atty., Toledo, Ohio, Raymond W. Fullerton, Aaron B. Kahn (argued), U.S. Dept. of Agriculture, Washington, D.C., for defendant-appellee.

Before LIVELY, Chief Judge, ENGEL, Circuit Judge, and SWYGERT, Senior Circuit Judge.*

LIVELY, Chief Judge.

This case concerns the liability of the Commodity Credit Corporation (CCC) to a borrower for amounts in excess of the loan balance upon sale of collateral. The district court found no such liability and we affirm.

## I.

### A.

The following statement of facts is taken from the district court's unpublished opinion:

In 1978 plaintiff Buckeye Sugars, Inc. (Buckeye) obtained federal price support loans from defendant CCC. These loans were secured by sugar refined by Buckeye from sugar beets. On September 26, 1979 Karl Ellenbrock, a CCC employee, sent a letter informing Buckeye that its 1978 loan would mature on October 31, 1979 and that Buckeye had the option of either repaying the loan or delivering the sugar securing the loan to CCC. Buckeye was requested to indicate whether it wished to repay the loan or deliver the sugar. Buckeye indicated to CCC that it wished to deliver the sugar to CCC.

In the fall of 1979 the Department of Agriculture was considering extending the 1978 price support program because a large number of price support loans were coming due, and a substantial number of loans might not be redeemed. In addition, it appeared that market prices for sugar might be improving and by extending the time period for the loans CCC could reduce the amount of sugar it would have to take over when the loans were not redeemed. The Department of Agriculture had implemented a similar program for the 1977 crop of sugar.

On October 31, 1979 Albert Roof, General Manager of Buckeye, received a telephone call from Karl Ellenbrock. Ellenbrock informed Mr. Roof that Buckeye had the option of obtaining a thirty-day extension on its loans. Later on that same day Roof informed Ellenbrock that Buckeye did not wish an extension on its loan and that the sugar, the collateral for the loan, would be forfeited.

On November 29, 1979 the Department of Agriculture issued regulations establishing an extended loan program for 1978 crop price support loans. 7 C.F.R. ¶ 1435.66 *et seq.* Shortly after these regulations were issued, Buckeye requested that CCC reinstate the loan status on the sugar forfeited on November 1, 1979. CCC refused and left the sugar, which Buckeye had forfeited, in the storage facilities of Buckeye and paid storage to Buckeye.

* The Honorable Luther M. Swygert, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

On May 7, 1980 CCC requested offers to purchase the sugar forfeited by Buckeye. Buckeye submitted a bid which was not the high bid. On May 23, 1980 CCC sold the sugar to others for $2,166,049. The amount of Buckeye's loans was $1,511,214.

Buckeye filed its action on December 19, 1980 and the parties filed cross-motions for summary judgment. Buckeye contended it was entitled to summary judgment on its claims because the transactions were secured transactions governed by the Uniform Commercial Code (UCC) which has been adopted into the federal common law. The UCC provides that generally upon default a secured party may dispose of collateral and must account to the debtor for any surplus. Therefore, because CCC sold the sugar in which it had a security interest for $654,835 more than the underlying indebtedness, CCC had an obligation to account to Buckeye for the excess amount it received.

### B.

The district court granted judgment to CCC, concluding that none of the four counts in the complaint survived CCC's motion for summary judgment. Buckeye does not argue on appeal that there were genuine issues of material fact which made summary judgment improper. Rather, it contends, the district court misconstrued the law and granted summary judgment to the wrong party.

The parties quite correctly agree that this case is controlled by federal law. However, they disagree on the nature of the federal law that controls. Buckeye contends that the federal common law controls and that federal common law requires the application of the UCC, particularly § 9–504(2) which provides that where a secured party disposes of collateral after default, "[i]f the security interest secures an indebtedness, the secured party must account to the debtor for any surplus...." CCC maintains that the statutory scheme of federal price supports for agricultural products is comprehensive and there is no basis for resort to federal common law.

### II.

#### A.

The mandate under which CCC currently operates dates from enactment of the Commodity Credit Corporation Charter Act in 1948, codified as amended at 15 U.S.C. § 714 *et seq.* (1982). The general powers of the CCC are set forth in 15 U.S.C. § 714b, including the following recitation in subsection (g):

(g) [CCC] [m]ay enter into and carry out such contracts or agreements as are necessary in the conduct of its business. State and local regulatory laws or rules shall not be applicable with respect to contracts or agreements of the [CCC] or the parties thereto to the extent that such contracts or agreements provide that such laws or rules shall not be applicable, or to the extent that such laws or rules are inconsistent with such contracts or agreements.

The district court found that CCC was entitled to summary judgment on several grounds, including the fact that the loan agreements with Buckeye contained a provision relieving CCC of any obligation to account to borrowers for excess proceeds from the sale of collateral. To apply § 9–504 of the UCC and require CCC to pay over the excess to Buckeye would be inconsistent with the parties' contract and thus would contravene 15 U.S.C. § 714b(g).

#### B.

Buckeye argues that the Commodity Credit Corporation Charter Act and the statute dealing with price support of agricultural commodities, the Agricultural Act of 1949, as amended, 7 U.S.C. § 1421 *et seq.* (1982), do not constitute a comprehensive scheme, but contain gaps which require the courts to fashion a federal common law in order to deal with the questions which arise under the statutes. In meeting this need with respect to other statutes involving federally funded and federally

guaranteed loans the courts have achieved consistency by adopting the UCC which controls commercial transactions in the private sector.

Buckeye relies principally on cases involving the Farmers Home Administration (FmHA), arguing that we should follow FmHA cases here because both FmHA and CCC make loans to farmers. This argument is not persuasive. The decision most heavily relied upon by Buckeye is *United States v. Hext*, 444 F.2d 804 (5th Cir.1971), a case involving an FmHA loan to a cattle farmer. In *Hext* the court adopted the UCC as the "principal fount of general commercial law governing secured transactions." *Id.* at 809–10. In determining to apply the UCC the court observed:

> An FHA [FmHA] loan is nothing more nor less than a secured transaction, with the United States as the secured party holding a security interest in property of the debtor in order to insure repayment of the loan.

*Id.* at 809.

This court has applied the UCC to FmHA loans, *United States v. Burnette-Carter Co.*, 575 F.2d 587 (6th Cir.), *cert. denied*, 439 U.S. 996, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978); *United States v. Carson*, 372 F.2d 429 (6th Cir.1967), and to Small Business Administration loans, *United States v. Willis*, 593 F.2d 247 (6th Cir.1979). In all of these cases, as in *Hext*, a transaction typical of the commercial world was involved, with the only distinguishing feature being that the lender or guarantor of an otherwise conventional secured transaction was a government agency. The federal "flavor" came from this fact alone, and there was no reason to apply any rule of decision different from that which controlled similar transactions in the private sector.

The same cannot be said of federal price support loans under the two statutes involved in this case. Only the government performs the function of guaranteeing minimum prices for agricultural commodities and there is no comparable endeavor in the private economy. The CCC was described as follows by the Supreme Court in *Rain-water v. United States*, 356 U.S. 590, 591–92, 78 S.Ct. 946, 948, 2 L.Ed.2d 996 (1958):

> Commodity is an "agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture." It was created by Congress to support farm prices and to assist in maintaining and distributing adequate supplies of agricultural commodities. Its capital was provided by congressional appropriation. Any impairment of this capital, which at times has been great due to the nature of its activities, is replaced out of the public treasury; any gains are returned to that treasury. All of its officers and other personnel are employees of the Department of Agriculture and are compensated as such. Like other government corporations, Commodity is subject to the provisions of the Government Corporation Control Act which provides such close budgetary, auditing and fiscal controls that little more than a corporate name remains to distinguish it from the ordinary government agency. In brief, Commodity is simply an administrative device established by Congress for the purpose of carrying out federal farm programs with public funds.

(Footnotes omitted.) In sum, the role of CCC differs significantly from that of a commercial lender, and general commercial statutes are not necessarily applicable.

### C.

We conclude that the two federal statutes involved here do constitute a comprehensive legislative scheme which controls the transactions between Buckeye and CCC. The Supreme Court cautioned in *Milwaukee v. Illinois*, 451 U.S. 304, 312–13, 101 S.Ct. 1784, 1789–91, 68 L.Ed.2d 114 (1981), that federal courts have no "general power to develop and apply their own rules of decision," and that "federal common law is 'subject to the paramount authority of Congress,'" *quoting New Jersey v. New York*, 283 U.S. 336, 348, 51 S.Ct. 478, 481, 75 L.Ed. 1104 (1931). These words mirror

the language employed by the Court in *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943): *"In the absence of an applicable Act of Congress* it is for the federal courts to fashion the governing rule of law according to their own standards." (Citation omitted) (emphasis added).

■ Courts should not search for gaps in legislation in order to fashion and apply federal common law. *Cf. Scripps-Howard Radio, Inc. v. Federal Communications Commission*, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942) ("We must be wary against interpolating our notions of policy in the interstices of legislative provisions."). The Commodity Credit Corporation Charter Act and the Agricultural Act of 1949 establish and control a uniquely governmental enterprise in providing price supports for sugar beet growers and a method of providing payments through loans to processors such as Buckeye. Since 15 U.S.C. § 714b(g) makes state laws which are inconsistent with the terms of a loan contract inapplicable to CCC transactions, the district court correctly concluded that § 9–504 of the UCC should not be applied here.

■ There is another compelling reason for holding that § 9–504 of the UCC does not apply. Buckeye did not default on its loan, and Part 5 of Article 9 of the UCC governs default situations only. Under the unique provisions of price support loans Buckeye had the option of delivering the collateral to CCC upon maturity of the loans in full satisfaction of its obligations under the loan agreement. It did not default; it merely chose an optional method of settling its debt. Since there was no default, even if the UCC were applicable to these transactions, § 9–504 would not have come into play.

Our conclusion is supported by logic and common sense. Under the statutory scheme Buckeye was in a "no lose" situation. It was paid the support price in the form of a nonrecourse loan. If the value of the collateral on the due date was less than the loan balance, it had the privilege of surrendering the collateral to CCC without any liability for the difference in value at that time or for any deficiency upon the ultimate disposition of the collateral. CCC bore all the "downside" risk and Buckeye declined its opportunity to extend the loan and participate in any improvement in the price of sugar. Under these circumstances, it is perfectly fair for CCC to reap any benefit which results from the ultimate sale of the collateral.

We do not reach the other grounds on which the district court relied in holding that the UCC does not apply to these transactions since we find the one discussed above dispositive of this issue.

### III.

#### A.

Buckeye also argues that it is entitled to recover the amount by which the "settlement value" of the collateral exceeded the balance of the loan. Buckeye was given the option in section 6(h) of the loan agreement of paying the loan at maturity or delivering to CCC "a quantity of the collateral commodity ... having a settlement value equal to the outstanding balance of the loan." Section 7(a) provides, "if, upon maturity of the note, the loan indebtedness ... is not satisfied by payment of the amount thereof or by delivery of an eligible commodity" CCC may take possession of the collateral and dispose of it. Under section 7(b) the producer is liable for a deficiency only if the quality or quantity of the commodity is less than represented to CCC in computing the amount of the loan. When CCC takes title to unredeemed collateral at maturity "it shall have no obligation to pay for any market value which such collateral may have in excess of the loan indebtedness."

■ Reading these provisions of the loan agreement together we conclude that CCC had no obligation to pay Buckeye the excess proceeds. At the time of delivery of the collateral to CCC the sugar did not have a settlement value equal to the out-

standing indebtedness. Since this resulted from market conditions and not from a deficiency in quality or quantity of the commodity, Buckeye incurred no liability for the shortfall. If the market value of the collateral had been greater than the loan balance on the date of delivery, CCC would have been liable to Buckeye for the excess value pursuant to section 6(i). ("If the settlement value of the commodity when delivered exceeds the amount due on the principal of the loan, the amount of such excess shall be paid to the producer by CCC.") The date of delivery was October 31, 1979, the date on which Buckeye elected to surrender the collateral rather than extend the loan. See *Autrey v. Commodity Credit Corporation*, 143 F.Supp. 550, 554 (W.D.Ark.1956) ("it is actually and finally delivered when the Corporation takes it over upon the borrower's failure to discharge his loan in cash."). The reason CCC offered to extend the loan was that the price of beet sugar was depressed on October 31, 1979. Having surrendered the collateral to CCC and thus having relieved itself of any liability for the difference between the value of the collateral and the loan indebtedness, Buckeye had no claim to any excess proceeds which an improvement in the market and ultimate sale by CCC might produce. The references to settlement value in the loan agreement are tied to the date of delivery, not to a future date when a sale of surrendered collateral may be made. There is no allegation in the complaint and no claim in Buckeye's affidavits that the market value of the collateral on October 31, 1979 exceeded the amount of the indebtedness. Of course, if that had been the case Buckeye would have elected to pay the notes in cash, selling the sugar to redeem the loans and retaining the excess itself.

### B.

■ Buckeye's final argument is that CCC acted arbitrarily and capriciously in failing to keep it fully informed of the possibility that the loans might be extended for more than 30 days, and in failing to "resurrect" its loans. There is no merit to this contention. The loan agreement had no provision for reviving loans once they had been satisfied, and the statutes do not deal with such a possibility. This appears to be a matter left to agency discretion and we cannot say that CCC abused its discretion in refusing to reinstate a loan where the indebtedness had been extinguished in a manner provided for in the loan agreement.

The judgment of the district court is affirmed.