In re The JULIEN COMPANY, Debtor.

COMMODITY CREDIT
CORPORATION,
Plaintiff,

v.

Jack MARLOW, Trustee for The Julien
Company, Defendant.

Bankruptcy No. 90–20283–B (jn).
Adv. No. 90–0127.

United States Bankruptcy Court,
W.D. Tennessee, W.D.

Aug. 16, 1990.

William W. Siler, Asst. U.S. Atty., Memphis, Tenn., for Commodity Credit Corp.

J. David Blaylock, Udelsohn, Blaylock and Marlow, Memphis, Tenn., for Jack F. Marlow, trustee.

Risa M. Rosenberg, Milbank, Tweed, Hadley & McCloy, New York City, for Bank Mees and Hope NV.

James F. Gleason, Jr., Hartzog, Calamari & Gleason, New York City, for Union Bank of Bavaria.

Robert F. Orians, Martin, Tate, Morrow & Marston, Memphis, Tenn., for Bankers Trust Co.

Julie C. Chinn, Memphis, Tenn., Asst. U.S. Trustee.

## MEMORANDUM OPINION AND ORDER

WILLIAM H. BROWN, Bankruptcy Judge.

This adversary proceeding arose after the filing of a motion by the Trustee to sell property free and clear of liens, the objection of the Commodity Credit Corporation ("CCC"), testimony and proof taken in regard to that motion, and the Court's entry of an order permitting, under certain conditions, the Trustee to sell property subject to CCC's claimed interests free and clear of liens or interests pending the determination of all issues related to the asserted position of CCC. After hearings conducted on the said motion, the Court determined, pursuant to Bankruptcy Rule 7001(2) that this was a proceeding "to determine the validi-

ty, priority, or extent of a lien or other interest in property;" therefore, all further hearings should be pursuant to an adversary proceeding. CCC thereafter filed this adversary proceeding, which has been answered, with a counterclaim, which also has been answered. After conclusion of the trial on July 26, 1990, the Court took all issues under advisement. This memorandum opinion and order constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (K), (M), (N), and (O).

## HISTORY OF THIS PROCEEDING

This case began with an involuntary Chapter 7 filing, after which the case was converted to Chapter 11, and a Chapter 11 Trustee was appointed. As a part of his responsibilities in liquidating assets of the estate, the Trustee moved the Court to sell certain cotton free and clear of liens, with any liens or interests to attach to the proceeds. Specifically, the Trustee took the position in that motion that CCC enjoyed a position no better than that of a secured creditor and that its security interests or liens in certain stored cotton could be satisfied by the Trustee's sale of that cotton and payment of valid lien claims. In contrast, the government took the position that the cotton subject to CCC's claims was not in fact property of the estate. At the hearing on the Trustee's motion and as Exhibit 5 to the deposition of Charles Cunningham, a representative of the Agricultural Stabilization and Conservation Service ("ASCS") the parties submitted, for placement under seal, a list of the principal debt owed to CCC and the number of bales stored in various states, against which bales CCC claimed its ownership interest. The number of bales and the value thereof is significant and the outcome of this adversary proceeding will have an impact on not merely the satisfaction of CCC's interests but the potential payment of other creditors' claims.

At the pretrial conference of this adversary proceeding, the parties agreed to preserve the testimony and evidence from the prior hearing on the Trustee's motion, heard on April 20, 1990, and to make that testimony and evidence a part of the record of this adversary proceeding.

## STATEMENT OF ISSUES

The issues presented to the Court are:

1. Whether the Trustee's interest in cotton placed in storage as collateral for CCC loans is property of the estate;

2. Whether the applicable CCC statutes and regulations establish a loan program under which CCC is the holder of a security interest;

3. Whether the applicable CCC statutes and regulations vest title to the collateral in CCC immediately upon maturity of the loans and failure to timely redeem, notwithstanding the automatic stay;

4. Whether the automatic stay applies to CCC so as to prohibit CCC from electing to take title to the stored cotton on which the time for redemption expires;

5. If the automatic stay applies, whether CCC should be given relief from the stay and whether CCC's interests are adequately protected;

6. Whether the Trustee may continue to redeem and sell the cotton collateral under 11 U.S.C. § 363(f), and whether CCC may be compelled to accept a money satisfaction of its interests; and

7. Whether CCC is entitled to receive all proceeds from the Trustee's sales, even if those proceeds exceed the loan amounts, and whether the Trustee should be required to abandon to CCC all cotton collateral on which the time for redemption expires.

The Court has concluded that the Trustee's interest in the cotton collateral is property of the estate, that the automatic stay applies, that the CCC program at issue is a loan program, that CCC is the holder of a security interest under the Bankruptcy Code, that CCC's interests are adequately protected, that the automatic stay acts to prevent title to the collateral automatically vesting in CCC, that the automatic stay acts to prevent CCC from exercising its "elections" as to the collateral, that CCC

presently is not entitled to relief from the stay, that the Trustee is not required to abandon the estate's interest in all collateral, and that the Trustee may continue ·to redeem and sell the collateral under § 363(f) so long as the sales are for sufficient amounts to satisfy the CCC loans and related charges.

### FINDINGS OF FACT

CCC administers the cotton price support loan program under authority of 7 U.S.C. § 1444, *et seq.* and the regulations at 7 C.F.R. § 1427, *et seq.* The regulations in 7 C.F.R. § 1427, *et seq.* govern price support loans for 1980 and subsequent crop years. 7 C.F.R. § 1427.1. The January 1, 1989 edition of the regulations are controlling.

■ CCC is a government corporation created under the United States Department of Agriculture for the purpose of carrying out programs designed to aid agriculture through market and price stabilization. 15 U.S.C. § 714, *et seq.*

■ The cotton price support loan program is administered for the purpose of stabilizing, supporting and protecting the price of cotton. 15 U.S.C. § 714 and 7 U.S.C. § 1444. The regulations for the program and all controlling documents are prepared by CCC. *See* C.F.R. § 1427.11.

Participating cotton producers (farmers) may apply for CCC Form A loans, with the loan values set annually for each crop year, and under the loan program producers may pledge warehouse-stored cotton to CCC under a nonrecourse, demand loan subject to the producer's right to redeem the cotton by repaying the loan to CCC on or before a fixed date. *See* 7 C.F.R. § 1427.6, § 1427.7 and § 1427.8. Thereby, the producer is given an opportunity to obtain an immediate, minimum return for a cotton crop while also permitting the producer to take advantage of any price increases by redemption and resale of the cotton.

The cotton producer executes a note and security agreement (CCC–Cotton A), an example of which was admitted as Exhibit 1. The form has the following printed conditional language:

The terms and conditions of the Note and Security Agreement are set forth in this Form CCC–Cotton A ("Note") and Form CCC–601 "Commodity Credit Corporation Note and Security Agreement Terms and Conditions," and any appendix thereto. By signing this Form CCC–Cotton A, each producer acknowledges receipt of Form CCC–601 and any appendix thereto.

The producer hereby sells, assigns, and mortgages to CCC as collateral for the payment of this Note all of the commodity described in this Note and Form CCC–Cotton A–1, Schedule of Pledged Cotton, together with all authorized replacements, substitutions, additions, and accessions thereto, which is stored in the warehouse specified in this Note.

This program will be conducted on a non-discriminatory basis without regard to race, color, religion, national origin, sex, marital status or handicap.

PRODUCERS REPRESENTATIONS. By signing this Form CCC–Cotton A, the producer makes the representations and warranties and agrees to all the terms and conditions specified in this Form CCC–Cotton A, Form CCC–601, and any appendix thereto.

An example of the Schedule of Pledged Cotton (CCC–Cotton A–1) was introduced as Exhibit 2.

The Commodity Credit Corporation Price Support Note and Security Agreement Terms and Conditions (CCC–601) (dated 4–27–88) was introduced as Exhibit 3. This entire document is important; however, in the definitions section found in the CCC–601, the "amount due" is defined as "the amount of the *loan* due CCC on the maturity date ..." (Emphasis added) "Collateral" is defined as being "the commodity described in the Note which has been pledged as *security* for a CCC price support loan." (Emphasis added) Paragraph 4 of CCC–601 provides that "[i]n lieu of repayment of the amount due, the producer may in accordance with Sections 9 and 10, *deliver the collateral* to CCC." (Emphasis added) Paragraph 6 of CCC–601, in discuss-

ing the collateral, provides: "The kind and quantity of the commodity which has been *pledged* by the producer as *collateral* for the satisfaction of the *loan* is described in the Note." (Emphasis added)

In discussing the maturity, the regulations provide that "CCC may, by public announcement, extend the time for repayment of the loan indebtedness or carry the loan in a past due status." 7 C.F.R. § 1427.7(a) "Public announcement" is not defined in the definition section of the regulations. 7 C.F.R. § 1427.2

Paragraph 10 of CCC–601 discusses warehouse-stored nonrecourse loans, and it is the Court's understanding that this section is applicable to loans involving collateral stored in a CCC approved warehouse. (*See* paragraph 10(a) of Exhibit 3) Paragraph 10(b) provides as follows:

> RIGHTS OF CCC. At any time *prior to the date CCC takes title* to the collateral or the date the producer redeems such collateral, in order to protect its interest, CCC may move the collateral from one storage location to another storage location or otherwise handle the collateral including the compression of cotton. Any charges incurred by CCC as the result of such action will be paid by the party redeeming such collateral. (Emphasis added)

Paragraph 10(c) provides as follows:

> SETTLEMENT. (i) If the producer elects to forfeit the collateral in satisfaction of the amount due in accordance with Section 4, the value of the collateral for purposes of settlement will be determined in accordance with the applicable program regulations on the basis of the weight, grade, and other quality factors stated on the warehouse receipt or supporting documents. (ii) The producer is responsible for any loss with respect to the quantity or quality of the collateral. If the settlement value of the collateral is less than the amount due, the producer will pay to CCC the amount of such deficiency plus interest which has accrued on such deficiency from the date of disbursement. (iii) If the settlement value of the collateral is greater than the

amount due, the amount of such excess will be retained by CCC and CCC will have no obligation to pay such amount to any party. (iv) CCC will not make any adjustment in the amount of the loan as the result of any subsequent redetermination of the quantity or quality of the collateral. (v) *Title to the collateral will vest in CCC on the day following the loan maturity date.* (Emphasis added)

If a producer decides to redeem the cotton pledged to CCC as security for a loan,

> the producer may receive the warehouse receipts (and the classification memoranda applicable to such cotton, if requested) upon payment of the loan, interest, and charges applicable to the bales of cotton being redeemed at the local county ASCS office . . .

7 C.F.R. § 1427.22(a)(1).

If the producer fails to timely redeem, the regulations authorize CCC to sell the forfeited cotton:

> (c) Sale by CCC. Upon maturity and nonpayment of a note, CCC is authorized without notice to the producer to sell, transfer, and deliver the cotton, or documents evidencing title thereto, at such time, in such manner and upon such terms and conditions as CCC may determine, at any cotton exchange or elsewhere, or through any agency, at public or private sale, for immediate or future delivery, and without demand, advertisement, or notice of the time and place of sale or adjournment thereof or otherwise; and, upon such sale, CCC may become the purchaser of the whole or any part of such cotton at its market value, as determined by CCC. Any overplus remaining from the proceeds received therefrom, after deducting from such proceeds the amount of the loan, interest, and charges shall be paid to the producer or to the producer's personal representative without right of assignment to or substitution of any other person. In the event the producer has made a fraudulent representation in the loan documents or in obtaining the loan, the proceeds received from the sale of the cotton shall be credited by CCC against

the amount due on the loan, and the producer shall be personally liable for any balance due on the loan.

7 C.F.R. § 1427.7(c).

As to transfer of title to CCC, the regulations provide:

**(b) When CCC takes title to commodity.** On or after maturity and nonpayment of the note, *title to the cotton shall, at CCC's election,* without a sale thereof, *vest in CCC* and CCC shall have no obligation to pay for any market value which such cotton may have in excess of the amount of the loan, plus interest and charges. (Emphasis added)

7 C.F.R. § 1427.7(b).

Section 1427.7 and CCC–601 refer to the producer, not to a buyer from the producer. (*See* definition of producer in 7 C.F.R. § 1427.4(a)).

Under the cotton price support loan program and 7 C.F.R. § 1427.22(c), the producer is authorized to transfer the right to redeem the stored cotton by utilizing form CCC–813, a copy of which was introduced as Exhibit 4. The Julien Company has a significant amount of cotton to which it claims an interest as the holder of CCC–813 forms, and the Trustee asserted that this cotton could be redeemed and sold in sufficient amounts to pay the government loans in full. Upon the execution and filing of the CCC–813 in the appropriate ASCS county office, the producer, or subsequent owner, transfers the equity in the stored cotton to the buyer identified on the form. The buyer agrees in part C of the CCC–813 that the buyer will redeem the cotton covered by this form "no later than the maturity date of the loan." Upon failure to redeem, two CCC "elections" are described in Part C of the CCC–813 as follows:

(a) At CCC's election, title to the cotton shall, without a sale thereof, immediately vest in CCC, and CCC shall have no obligation to pay for any market value which the cotton may have in excess of the amount of the loan thereon, plus interest and charges. If the amount of the loan, plus interest and charges, exceeds the market value of the cotton as determined by CCC, the Buyer/Sub-

sequent Buyer shall be liable to CCC for the difference.

(b) At CCC's election, CCC is authorized, without notice to the Buyer/Subsequent Buyer, to sell, transfer, and deliver the cotton or documents evidencing title thereto, at such time, and in such manner, and upon such terms and conditions as CCC may determine, at any cotton exchange, or elsewhere, or through any agency, at public or private sale, for immediate or future delivery, and without demand, advertisement, or notice of the time and place of sale or adjournment thereof or otherwise, and upon such sale, CCC may become the purchaser of the whole or any part of such cotton at its market value, as determined by CCC. If the proceeds from the sale do not cover the amount of the loan on such cotton, plus interest and charges, the Buyer/Subsequent Buyer shall be liable to CCC for the difference.

In the event of no timely redemption by a buyer, the portion of the regulations dealing with forfeiture of the cotton is a part of § 1427.22(c)(2). Upon the buyer's failure to redeem cotton pledged as collateral, two elections are available to CCC under the regulations and they differ in part, but significantly, from the elections found in the CCC–813:

(i) Title to the cotton shall, at CCC's election and without a sale thereof, immediately vest in CCC, and there shall be no obligation on the part of CCC to pay for any market value which such cotton may have in excess of the principal amount of the loan thereon, together with any applicable interest and other charges. The buyer shall be personally liable for any amount by which the amount due on the loan on such cotton exceeds the market value of the cotton as of the date title to the cotton vests in CCC, as determined by CCC.

(ii) CCC may, at CCC's election and without notice to the buyer, sell, transfer and deliver the cotton or documents evidencing title thereto, at such time, and in such manner, and upon such terms and conditions as CCC may determine, at any

cotton exchange or elsewhere, or through any agency, at public or private sale, for immediate or future delivery, and without demand advertisement, or notice of the time and place of sale or adjournment thereof or otherwise. Upon such sale, CCC may become the purchaser of the whole or any part of such cotton at its market value, as determined by CCC. *Any overage remaining from the proceeds received therefrom shall, after deducting from such proceeds the principal amount of the loan on such cotton, together with any applicable interest, and other charges, be paid to the buyer or the buyer's personal representative without right of assignment to, or substitution of, any other person.* If the proceeds from the sale do not cover the principal amount of the loan on such cotton, together with any applicable interest and other charges, the buyer shall be liable to CCC for any difference. (Emphasis added)

7 C.F.R. § 1427.22(c)(2)(i), (ii).

Following Part D of CCC–813, covering "CCC's Agreement," this language is found: "1. Notwithstanding any of the provisions of this instrument, payment of the amount due on the cotton will not be accepted *after CCC acquires title* to the cotton." (Emphasis added)

The regulations also provide, as to the producer, that "[r]epayment of loans will not be accepted after CCC acquires title to the cotton." 7 C.F.R. § 1427.22(a)(4). As to the buyer, the regulations state that redemption is "not permitted after the maturity of the loan." 7 C.F.R. § 1427.22(c)(2).

The CCC–813's can be marketed (7 C.F.R. § 1426.22(c)(1)); however, in this case some of the CCC–813's time for redemption has expired either pre-bankruptcy or post-bankruptcy.

In addition to the claims of CCC to the stored cotton, at least three creditors assert secured claims against the stored cot-

ton [1], and warehousemen and other storage liens may be asserted.

In the sales contemplated by the Trustee, no creditor would be primed over CCC's lien. That is, if CCC is a first lien holder, CCC would in fact receive the first proceeds. The only exception may be for satisfaction of allowed storage and transit charges, if those charges are not a part of the CCC lien claim. *See,* 7 C.F.R. § 1427.13.

CCC loans, of course, bear interest "at the rate announced in a separate notice published in the Federal Register." 7 C.F.R. § 1427.16.

Testimony from Tommy Malone, a Vice–President with Allenberg Cotton Company, confirmed that at redemption time, the producer or holder of a CCC–813 may repay either the lesser of (1) the loan amount plus interest and storage charges or (2) the "Adjusted World Price" which has differentials including, for example, location and grade of the cotton.[2] *See,* 7 C.F.R. § 1427.8. The cotton stored and subject to CCC loans is a 1988 cotton crop on which prices are now high, with the trend to go higher until a new cotton crop becomes available in September, 1990. Mr. Malone testified that he had examined some of the CCC–813's to make a sample of the 1988 crop available for sale, after which he concluded that Julien's position was worth from $5.00 to $70.00 per bale over the government repayment amount, which value could increase if the Trustee were given time to properly market and sell the cotton.

Mr. Malone's concern was that if the cotton is forfeited to the government, the government would catalog it and sell it through that means, and that it was likely that the catalog would come out at the same time as the new 1990 cotton crop, resulting in a depressed value of all cotton at that time. However, it was admitted that CCC could exercise an option of holding the cotton rather than cataloging it.

---

1. An order permitting three banks to intervene in this adversary proceeding was entered July 18, 1990.

2. The Adjusted World Price was explained at pages 28–30, Cunningham deposition. Fortunately, the intricacies of that calculation are not relevant to the issues to be decided.

(*See* also page 66, Cunningham deposition) Typically, it takes CCC sixty days after forfeiture to be "in a position [to put the cotton] in a catalog" for sale. (Page 69, Cunningham deposition)

Carol Skelly of Agricultural Stabilization and Conservation Service ("ASCS") is an agricultural economist and her division does economic work for the national cotton programs, including the cotton price support loan program. Her testimony established that any eligible farmer (producer) can put cotton into the CCC loan program, at which point the cotton is ginned, graded, and put into a government approved warehouse. *See*, 7 C.F.R. § 1427.10. The warehouse receipts then collateralize the CCC loan. *See*, 7 C.F.R. § 1427.12.[3] The producer may redeem the cotton or may let it be forfeited at the producer's choice. The loans are first set up for a ten month redemption period and may be extended for eight additional months. *See*, 7 C.F.R. § 1427.7(a). Ms. Skelly testified that these loans were nonrecourse, meaning that if the producer failed to redeem, there was no recourse against the producer.[4] Further, she testified that CCC was not required to give any notice of the expiration of the redemption period, and that typically, upon expiration of the redemption period, the ASCS offices would bundle the warehouse receipts and send them to the Kansas City office of CCC. She further testified that there were some Julien CCC–813's which had expired prior to the bankruptcy filing and some have expired subsequent thereto; however, there are some unexpired CCC–813's.

On cross-examination of Ms. Skelly, she confirmed that the warehouse receipts were collateral, and she testified that by the time the local ASCS sent the warehouse receipts to Kansas City, ownership was in CCC. She further testified that as of April 20, 1990, CCC had not determined the value of the Julien cotton in CCC loans.

Ms. Skelly testified that she was not familiar with the regulations at the level of the election to be made by CCC in the event of no timely redemption.

The United States Department of Agriculture distributed to "Cotton State and County Offices" a notice of the Julien Company bankruptcy filing. (Exhibit 7) The notice bears a date of January 25, 1990 (and a "Disposal" date of August 1, 1990) and directs the county offices and loan servicing agents to "[c]ontinue to accept repayments from The Julien Company for cotton covered by CCC–813's on file. Cash repayment shall include principal and interest plus outstanding charges against the loan." Further, the instructions advised that "[o]n loans covered by CCC–813's from The Julien Company that have been matured or will mature: (1) Take no forfeiture action. (2) Keep warehouse receipts in the County Office until further notice, unless The Julien Company requests to redeem the loans. (3) Permit The Julien Company to repay matured loans. Cash payment shall include principal and interest plus outstanding charges against the loan." It was stipulated by government counsel that this notice had been mailed to all ASCS offices.

The Trustee testified that CCC had permitted the Julien Company to redeem certain expired CCC–813's, and Exhibit 8 was introduced as a part of the records from the Julien Company to demonstrate that the Julien Company had sold expired CCC–813's to Ford Trading Company, which in turn redeemed cotton on March 27, 1990. In its redemption, the Ford Trading Company used the "world price."

Mr. Charles Cunningham, a twenty-eight year veteran of ASCS, testified concerning

---

**3.** The regulations provide in part: *"General:* Producers may obtain loans on cotton represented by warehouse receipts only if the warehouse receipts are negotiable machine cardtype warehouse receipts, are issued by CCC approved warehouses, provide for delivery of the cotton to bearer or are properly assigned by endorsement in blank, so as to vest title in the holder of the receipt, and otherwise are acceptable to CCC."

**4.** There may be recourse against the producer if "the producer has made a fraudulent representation in the loan documents or in obtaining the loan." 7 C.F.R. § 1427.7(b) and § 1427.7(c). And, recourse loans may be made to a producer. 7 C.F.R. § 1427.26.

the regulations found in 7 C.F.R. § 1427, which govern the cotton price support loan regulations for upland cotton. He testified that when an eligible producer enters into a CCC loan, "we retain the warehouse receipt as collateral for that loan." (Page 10, Cunningham deposition) At the loan's inception, CCC does not take possession of the cotton, which is stored in an approved warehouse. Until forfeiture, the cotton collateral continues to be the property of the producer. (Pages 23–24, Cunningham deposition)

When cotton is redeemed from a loan, "the person removing the cotton from storage shall pay all unpaid warehouse charges at the established tariff rate." 7 C.F.R. § 1427.10

The appropriate loan documents are developed in Washington and are generated by computer in local ASCS offices. (Pages 13–14 of Cunningham deposition) The procedure in the county ASCS office, after a loan is made, is to retain the warehouse receipts "until that loan is repaid." Copies of the loan documents are distributed, but the originals are retained in the county office. Accounting records are maintained in the "ASCS Kansas City management office." (Pages 18–19, Cunningham deposition; *see also* 7 C.F.R. § 1427.20, § 1427.25)

Mr. Cunningham testified that the April 27, 1988 CCC–601 was the current document detailing the terms and conditions of cotton loans. No appendix to the CCC–601 exists at the present time. (Pages 20–23, Cunningham deposition)

When a producer sells and utilizes the CCC–813, the loan "in effect becomes a recourse loan at that point." (Page 34, Cunningham deposition; *see also* Part C, CCC–813, Exhibit 4) If CCC elects to take title to forfeited cotton, the buyer under a CCC–813 is liable for any losses CCC might suffer. (Page 35, Cunningham deposition) If CCC elects to sell or otherwise dispose of the forfeited cotton, the buyer is still liable for any CCC losses. (Page 36, Cunningham deposition)

After the maturity date on a loan, the normal forfeiture "procedure is that the county [office] immediately following that date packages up the warehouse receipts and loan documents, and sends them to Kansas City who then records them into the CCC inventory." Because of the bankruptcy and the notice to withhold any forfeiture action (Exhibit 7), the Julien warehouse receipts and loan documents are "still in the county offices," even if the redemption time has expired. (Page 64, Cunningham deposition)

## CONCLUSIONS OF LAW

### 11 U.S.C. § 363(f)

This Code section provides:

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

CCC disputes that the Code provides authority for the Trustee to redeem and sell the stored cotton. The Court, in an interim order on the Trustee's motion to sell free and clear of any interest, ruled that the Trustee could sell, pursuant to 11 U.S.C. § 363(f)(4).[5] CCC now contends that this subsection will only apply until the Court rules on the merits, at which time there will no longer be a dispute as to the interests in the stored cotton. The Court's interim order protected CCC in its requirement that if the Trustee redeemed cotton, the Trustee must sell the cotton for a sufficient amount to satisfy CCC's loan and

---

5. *See* Interim Order Permitting Sale of Cotton Held By CCC, May 3, 1990.

related charges in full as to that specific cotton. At the final hearing in this adversary proceeding, the Trustee stated that to date he had been able to sell all redeemed cotton for an amount sufficient to pay CCC's loan and related charges.

 In this opinion, the Court concludes that the Trustee may continue to redeem the stored cotton. If the Trustee is to redeem, the Trustee must be able to sell the cotton in order to pay CCC. Section 363(f)(3) does not provide authority for continued sales because the total liens and interests claimed against this cotton by CCC, other secured lenders, warehousemen and shippers exceed the value of the cotton. However, in the event of an appeal from this Court's order, the interests of CCC and the Trustee will presumably continue to be in "bona fide dispute" so that § 363(f)(4) will continue to provide authority for the Trustee's sale pending appellate review.

 Moreover, § 363(f)(5) is applicable, notwithstanding CCC's argument that it cannot be "compelled ... to accept a money satisfaction of [its] interest." 11 U.S.C. § 363(f)(5). CCC refers to 15 U.S.C. § 714b(c) for authority that it "may sue and be sued, but no attachment, garnishment, or other similar process, mesne or final, shall be issued against [CCC] or its property." *See, e.g., Iowa ex rel. Miller v. Block,* 771 F.2d 347, 348 n. 1 (8th Cir.1985), *cert. denied* 478 U.S. 1012, 106 S.Ct. 3312, 92 L.Ed.2d 725 (1986). However, there is no violation of 15 U.S.C. § 714b(c) involved here. Rather, the Court has concluded in this opinion that CCC is the holder of a security interest under the Bankruptcy Code. As such, CCC is entitled only to satisfaction of its secured claim. Section 363 is applicable to property of the estate and thus to entities claiming an interest in the bankruptcy estate, and 11 U.S.C. § 101(14) defines entity to include a "governmental unit" such as CCC. Section 363(f) authorizes sales of property free and clear of the interest of any entity, and 11 U.S.C. § 106(c)(1) makes it clear that any provision of the Bankruptcy Code referring to "entity ... applies to governmental units." The result of this Court's order is merely to treat CCC the same as all other holders of security interests, a result which does not violate the Bankruptcy Code or 15 U.S.C. § 714b(c). *See, In re Martin,* 761 F.2d 472, 478 (8th Cir.1985) ("CCC, as a governmental unit, is bound by the provisions of section 363 to the same extent as any other secured creditor.")

## PROPERTY OF ESTATE

 The Court has concluded that the Trustee's interest in the cotton is property of the estate. 11 U.S.C. § 541(a). As discussed later, the Trustee is still the owner of the cotton, which is merely collateral for the CCC loans until CCC exercises one of its elections with reference the collateral. If the Trustee's interests were merely redemption rights, a right of redemption, if still alive upon the date of bankruptcy filing, is a sufficient property interest to be property of the bankruptcy estate. *See, e.g., In re Wheeler,* 5 B.R. 600 (Bankr.N.D. Ga.1980); *In re Bialac,* 712 F.2d 426 (9th Cir.1983) ("[P]re-foreclosure right to redeem is a property right under Section 541.") CCC argues that the automatic stay does not extend the Trustee's redemption period; however, the Court is not faced with a specific statutory redemption period such as in *In re Glenn,* 760 F.2d 1428, 1442 (6th Cir.1985), *cert. denied,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985) (§ 362(a) does "not toll or extend the running of state statutory periods of redemption following foreclosure sales.") Rather, the Court is faced with a contractual redemption opportunity which is terminated only by CCC making one of its administrative elections under its regulations. The simple fact is that CCC has never made either election. CCC has not yet foreclosed on the collateral. The Court concludes that the Trustee has an ownership interest in the cotton, until that interest is divested by proper elective action on the part of CCC. The redemption referred to in the context of the CCC loan transactions is not redemption after foreclosure; rather, it is redemption of the cotton from a collateral position.

## AUTOMATIC STAY

■ As a part of its position, CCC states that 15 U.S.C. § 714b(c) is also support for its argument that the automatic stay should not apply to prohibit CCC from taking title to that cotton for which the maturity date has expired. However, the Court's conclusion is that CCC has only a secured creditor's interest in the stored cotton, which is also subject to the estate's property interest. Section 714b(c) of Title 15 was amended by Act of June 7, 1949. The current Bankruptcy Code was enacted in 1978. Obviously, Congress was aware of Title 15 when the Bankruptcy Code was enacted, and this Court sees no reason why the automatic stay should not apply to CCC just as it does to other government agencies to prevent foreclosure or other action in reference security interests. *See, e.g., U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 2316, 76 L.Ed.2d 515 (1983) (No reason why IRS lien claim should be treated differently than any other secured claim); *accord, U.S. v. Norton*, 717 F.2d 767, 773 (3rd Cir.1983); *U.S. v. Ketelsen*, 104 B.R. 242 (D.S.D.1988), *aff'd*, 880 F.2d 990 (8th Cir.1989). The automatic stay has been applied to CCC, for example, in setoff circumstances. *See, e.g., U.S. v. Rinehart*, 88 B.R. 1014 (D.S.D.1988); *aff'd in part, and rev'd in part, SBA v. Rinehart*, 887 F.2d 165 (8th Cir.1989); *In re Haffner*, 25 B.R. 882, 884 (Bankr.N.D.Ind.1982).

As a secured creditor, CCC is entitled to adequate protection of its interest in the collateral. 11 U.S.C. § 361. Clearly, if the Trustee sells for a sufficient amount to satisfy CCC's secured claim in full, CCC has its adequate protection. The Trustee has agreed, and the Court will so order, that if the Trustee is unable to sell specific bales of cotton for such an amount, the Trustee will abandon that cotton to CCC. After that point, CCC may have an unsecured deficiency claim against the estate. Again, CCC is being treated as any other secured creditor in this case would be treated.

## SECTION 108(b)

■ Section 108(b) of the Bankruptcy Code provides:

### § 108 Extension of time.

(b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case be, before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) 60 days after the order for relief.

Sub-section (1) is controlling here because the Trustee's opportunity to redeem has been extended by CCC in its notice to all local ASCS offices. (Exhibit 7) CCC, both by that notice and by its failure pre-bankruptcy to exercise one of its regulatory elections, has suspended the running of the redemption opportunity as to the Trustee. The automatic stay precludes CCC's efforts to alter that suspension. *In re Thom, Inc.*, 95 B.R. 261, 263 (Bankr.D. Me.1989) (§ 108(b) "does not stay the running of any time period but extends a time period.") Moreover, under the regulations to be discussed, CCC will not be prejudiced by the effect of the automatic stay, since CCC will be paid its secured debt in full or receive the collateral. CCC would not be entitled to receive any profit from sale of the collateral. To not allow the Trustee to sell the collateral would be detrimental to other creditors. In other words, the equities do not favor CCC's demand for title to the cotton.

## CCC IS A SECURED CREDITOR

■ Thus, the Court must discuss why it has concluded that CCC is a secured creditor rather than an owner of the stored cotton. The starting point is that CCC is an entity subject to the Bankruptcy Code's provisions, including § 362. Next, a re-

view of the applicable CCC documents and regulations has been conducted, after which the Court concludes that, under the regulations, notes and security agreement, and related documents, CCC does not obtain title to the cotton collateral until there has been a default under the loan and an election by CCC. Finally, CCC's right to enforce its secured claim against the collateral is stayed by 11 U.S.C. § 362(a).

CCC argues that no action on its part is required to effect a forfeiture; therefore, the automatic stay does not apply. However, the regulations and documents refer to "elections" by CCC, notwithstanding a silence on what constitutes an election. Whatever an election may be, CCC's election to cause title to the stored cotton to vest in CCC is subject to the provisions of 11 U.S.C. § 362(a), just as any other foreclosing creditor's action would be.

Election concepts impose discretion on CCC to make a choice between seizure or sale of the collateral. Doing neither is not a choice described in the regulations. Failure to make an election simply means that CCC has, by inaction, treated the loan as delinquent. That is not the same as a forfeiture of the collateral. Testimony of Ms. Skelly supports that CCC has the discretion to extend a loan past its maturity date. Exhibit 7 is evidence of CCC's decision to treat the matured Julien loans as active loans, albeit delinquent. Specifically, Exhibit 7 directs all local offices to take no forfeiture action. In fact, Exhibit 7 may constitute a "public announcement" of CCC's decisions to carry the loans in past due status.

In reaching its conclusion that CCC is but a secured creditor, the Court has been reminded by the Supreme Court's recent instruction that "the fundamental canon [is] that statutory interpretation begins with the language of the statute itself." *Pennsylvania Public Welfare Dept. v. Davenport,* — U.S. —, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990); *see also U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The same is true of regulatory interpretation. As the Court of Appeals for the Federal Circuit has observed: "[A] regulation cannot be construed to mean what an agency intended but did not adequately express." *Amalgamated Sugar Co. v. U.S.,* 770 F.2d 1042, 1044 (Fed.Cir.1985), *quoting, Usery v. Kennecott Copper Corp.,* 577 F.2d 1113, 1119 (10th Cir.1977). This Court has read the regulations, applicable statutes, and documents for their plain meaning, and the Court has concluded that the cotton price support loan program is just that—a loan program.

CCC points to *In re Haffner,* 25 B.R. 882 (Bankr.N.D.Ind.1982) for authority that the transactions involving pledged cotton are only "technically a loan. In actuality, the transaction is a sale with the option to repurchase." 25 B.R. at 884. This Court cannot agree with this dicta from the *Haffner* opinion, which dealt with setoff when the Chapter 11 debtors were seeking a postpetition payment for participation in a CCC crop storage program. As previously discussed, this Court can agree with the *Haffner* Court's conclusion that § 362 "includes governmental units within its scope." 25 B.R. at 887.

A natural reading of the enabling statute, 7 U.S.C. § 1444, *et seq.,* the regulations, 7 C.F.R. § 1427, *et seq.,* and the CCC documents, Exhibits 1–4, leads to the conclusion that Congress intended to establish and the agency intended to implement a loan program. The Court must enforce the loan concept which includes a recognition that the cotton at issue is only collateral for a loan. The cotton is not yet the property of CCC. CCC merely has a security interest in the cotton which this Court must and will protect. But, this Court is not required to elevate CCC above a secured status. In *U.S. v. Energy Resources Co., Inc.,* — U.S. —, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990), the Supreme Court held that a bankruptcy court "may order IRS to apply tax payments to offset trust fund obligations where it concludes that this action is necessary for a reorganization's success." Underlying this holding, the Court commented on the bankruptcy court's § 105 power as being part of the "statutory directives [which] are consistent with the traditional understanding that

bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." 110 S.Ct. at 2142. (citations omitted)

As the regulations under 7 C.F.R. § 1427, et seq. provide, they "set forth the requirements with respect to price support loans on cotton" for the applicable crop year. 7 C.F.R. § 1427.1 CCC, ASCS and/or the Department of Agricultural are the authors of the regulations, and the government entities cannot escape the restrictions set out by their regulations. The initial transfer between the producer and CCC is a loan rather than a conditional sale. This conclusion is obvious from a plain reading of the regulations, and it is consistent with this conclusion that the producer is permitted to transfer the equity in the cotton pledged as loan collateral to a purchaser by utilization of the CCC–813 form. The concept of transfer by the producer recognizes that the producer rather than CCC is the owner of the stored cotton. Until all opportunity for redemption is exhausted, the producer or the holder of a CCC–813 continues to be the owner of the cotton. Mr. Cunningham testified that, until forfeiture of the collateral, the cotton was property of the producer or buyer. The Julien Company's Trustee, as the holder of the CCC–813 forms, is the owner of the cotton at issue here, and the bankruptcy estate obviously has an interest in that cotton.

The regulations merely give CCC a choice of protection in the event of failure to redeem by either the producer or the CCC–813 buyer. CCC attempts to treat its rights as giving an absolute, automatic transfer of title to the stored cotton collateral as soon as the maturity date passes. If normal concepts of secured transactions applied, that would not be true because CCC would be obligated to act in a commercially reasonable manner in seizing and disposing of collateral. However, this Court is aware that Uniform Commercial Code ("UCC") concepts may not govern CCC loans. *Buckeye Sugars, Inc. v. CCC*, 744 F.2d 1240 (6th Cir.1984); *compare, In re Ferguson*, 112 B.R. 820, 823–824 (Bankr.N.D.Tex.1990) (15 U.S.C. § 714b(g) does not "expressly authorize the CCC to pre-empt states' secured transaction laws," and "third party contracts are outside the scope of the CCC's pre-emption authority.")

Disregarding normal commercial law concepts, CCC does not automatically gain title to cotton collateral under its own regulations. Both as to the producer under 7 C.F.R. § 1427.7(b) and (c) and the buyer under § 1427.22(c)(2), CCC has an election which it may exercise, *either* to take title to the cotton *or* to sell the cotton. As to the producer, if CCC elects to take title, this occurs without a sale and CCC is not accountable to the producer for any excess market value over the loan charges due. If, on the other hand, CCC elects to sell the cotton, CCC is accountable to the producer for any "overplus" received from a sale. 7 C.F.R. § 1427.7(c).

The same basic two elections exist in the case of a CCC–813 buyer who fails to redeem the collateral upon loan maturity. First, CCC may elect to let title to the cotton vest in CCC, in which event there is no sale of the cotton under the provisions of 7 C.F.R. § 1427.22(c)(2)(i). After this election, CCC is again not obligated to pay the buyer any excess of market value over the loan amount due. Simply put, CCC may choose to retain the cotton, whatever its value may be. However, the buyer is a *recourse buyer who is liable to CCC for any amount by which the loan amount exceeds the market value.* In this case, there is no proof that CCC intended to take title to and retain the cotton indefinitely. A sale was contemplated, at some point, by CCC.

The second election available to CCC, as to a nonredeeming buyer, is to sell the cotton collateral under 7 C.F.R. § 1427.22(c)(2)(ii), which permits, rather than mandates, CCC to sell, in which event CCC may become the purchaser at such sale. In the event of a sale, CCC is accountable to the buyer, with the regulations requiring CCC to pay any excess or "overage" to the buyer, after satisfaction of the loan amounts due. If the sale proceeds fall short of the loan amounts due, the buyer, being a recourse buyer, is liable to CCC.

■ A natural, unstrained reading of the regulations leads to this Court's conclusion that, as to a buyer such as this Trustee, CCC is but a secured creditor, with two choices available in the event a buyer fails to redeem. CCC ignores the plain meaning of its regulations when it attempts to force an interpretation that it is vested automatically with title upon failure to timely redeem. The regulation permits an election, not an arbitrary seizure of collateral which would occur by CCC's doing nothing. CCC must make an administrative decision under the regulations either to take title to and retain the cotton or to sell the cotton. In this case CCC had made no election prior to the bankruptcy filing and the automatic stay prohibits either election now, without relief from this Court.

The Court is disturbed that the CCC–813 elections omit the regulation's requirement that in the event of CCC's election to sell the collateral, CCC is required to pay the buyer any excess over the loan amounts due. Compare CCC–813, Part C with 7 C.F.R. § 1427.22(c)(2)(ii). The Court finds the CCC–813 to be misleading as to a buyer such as this Trustee. Also, CCC–601 does not address a buyer or CCC's elections as to a buyer. However, it is the regulations which must prevail over the CCC–813 or CCC–601, and the Court will hold CCC to the mandates of its regulations.

It may be argued that the regulations do not permit an untimely redemption. 7 C.F.R. § 1427.22(c)(2). However, there is a conflict in the regulations as to a bar on repayment of the loan. As to the producer, 7 C.F.R. § 1427.22(a)(4) provides that "[r]epayment of loans will not be accepted after CCC acquires title to the cotton." As noted, acquisition of title requires an election by CCC under 7 C.F.R. § 1427.27(b) or (c). As to the buyer under a CCC–813, "[r]edemption will not be permitted after the maturity date of the loan." 7 C.F.R. § 1427.22(c)(2). As an illustration of the nature of the organization of the regulations, this latter provision is found in the same paragraph with the provisions for loan documents being sent to a bank for collection and charges assessed by the bank for such services. Also, the time bar as to buyers conflicts with the printed provision of the CCC–813 that payment will not be accepted after "CCC acquires title to the cotton."

The Court reads the regulations' bar of untimely redemption by the buyer as a part of the elections available to CCC. The testimony of a CCC representative indicated that CCC had in the past treated some loans as delinquent, unilaterally extending the loans. *See* 7 C.F.R. § 1427.7(a). In this case, there was a specific decision by CCC to retain the loans at issue in a matured, delinquent status. *See* Exhibit 7. As to this notice to local ASCS offices, the government argues that it merely was seeking to avoid any risk of violation of the automatic stay; although, it did not believe the stay applied. *See, NLT Computer Services Corp. v. Capital Computer Systems, Inc.,* 755 F.2d 1253, 1258 (6th Cir.1985) ("The stay provisions of section 362 are automatic and self-operating and those who have knowledge of the pendency of a bankruptcy action and stay are bound to honor the stay unless and until it is properly lifted.") The stay did apply and does apply, and CCC correctly recognized that fact. In effect, CCC instructed its office to make no election under the regulations. Further, CCC advised in Exhibit 7 that the local offices should continue to allow the debtor to redeem cotton.

By preventing CCC from arbitrarily claiming title to this cotton collateral, § 362(a) and this Court are merely recognizing that CCC has not yet made either of its elections under its regulations, and no justification exists at this time to permit CCC relief from this stay to make an election.

CCC refers this Court to *Buckeye Sugars, Inc. v. CCC,* 744 F.2d 1240 (6th Cir. 1984) as being on point. However, *Buckeye Sugars* is not controlling on the issues before this Court. In *Buckeye Sugars,* the producer obtained price support loans from CCC, which were secured by sugar refined by Buckeye from sugar beets. CCC notified Buckeye of the loans' maturity and Buckeye specifically notified CCC that it

was forfeiting the sugar rather than paying the loans. CCC thereafter sold the sugar for more than the loan amount, and Buckeye contended that the Uniform Commercial Code should control and that Buckeye was entitled to the excess proceeds. The Sixth Circuit pointed out that the UCC did not apply because of the provisions in 15 U.S.C. § 714b(g) that "[s]tate and local regulatory laws or rules" do not apply to CCC contracts. Further, the *Buckeye Sugars* Court discussed the function of CCC and concluded that "the role of CCC differs significantly from that of a commercial lender, and general commercial statutes are not necessarily applicable." 744 F.2d at 1243, citing *Rainwater v. U.S.*, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958).

This Court is mindful of the Sixth Circuit's warning that a court should not substitute its "notions of policy in the interstices of legislative provisions." 744 F.2d at 1244, *quoting, Scripps–Howard Radio, Inc. v. FCC,* 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942). However, *Buckeye Sugars* involved a producer who chose to deliver the collateral to CCC in satisfaction of a nonrecourse loan. Under the circumstances in that case, the Sixth Circuit found it "perfectly fair for CCC to reap any benefit which results from the ultimate sale of the collateral." 744 F.2d at 1244. In contrast here, the regulations mandate that in the event of CCC's election to sell a nonredeeming buyer's cotton, CCC is not entitled to any profit. Thus, the present regulations as to this loan program distinguish this case from both *Buckeye Sugars* and *Rainwater.*

It must be noted that the primary distinction from *Buckeye Sugars* is that it was not a bankruptcy case; therefore, the automatic stay and other bankruptcy concepts were not of concern. Here, CCC had not exercised its elections prior to bankruptcy nor had the Julien Company elected to forfeit the collateral. The bankruptcy filing and its doctrines of property of the estate and automatic stay make this case and proceeding markedly different from *Buckeye Sugars.* It is not the UCC which makes CCC a secured creditor. The Bankruptcy Code and the CCC regulations and documents mandate that result. 11 U.S.C. § 101(43), (44), (45) and § 506.

Also, in contrast to *Buckeye Sugars,* in the present case the Trustee stands in the position not of the producer but of the buyer under a CCC–813. As such, the Trustee is now involved in a recourse loan with CCC. 7 C.F.R. § 1427.22(c)(2). If the government prevails, there is no assurance that it will be made whole in its cataloging or sale process. CCC is subject to the vagaries of the market as is the Trustee. If CCC fails to obtain a full payoff, CCC may file a claim for the deficiency. On the other hand, according to CCC's witnesses, if CCC obtained a profit on forfeited cotton, that profit would not be turned over to this estate. The Court disagrees because of its reading of the regulations; however, if CCC had its way, CCC would take title to the cotton (election 1), then sell it (election 2), thereby merging the two distinct elections, and then retain all profit (ignoring 7 C.F.R. § 1427.(c)(2)(ii)), while holding the Trustee to a recourse position if CCC realized a deficiency. By permitting the Trustee to redeem and sell for more than CCC's loan, the Court is effectively implementing the second election for CCC under which CCC is entitled to be paid in full but leaving the excess with the Trustee for distribution to other creditors. This is not only treating CCC as its regulations require but is allowing a fair treatment of all creditors.

It is true that the Trustee, if he sells for less than CCC's loan, will be subject to a claim for the deficiency, and the Court reserves for later determination whether such a claim would be administrative in nature.

## CONCLUSION

In summary, the Court concludes that the applicable CCC cotton program is a loan program which does not automatically vest title in CCC upon the failure of a CCC–813 buyer to redeem cotton placed in a warehouse as collateral for a loan. CCC is the holder of a security interest in the collateral, and CCC enjoyed the regulatory right to make an election either to take title to the forfeited collateral or to sell the

collateral. The proof established that CCC had made neither election prior to the bankruptcy filing. Thus, there had been no prebankruptcy foreclosure on the collateral, and the cotton became property of this bankruptcy estate. Apparently, there is equity in the cotton, which may be redeemed by the Trustee so long as the Trustee is able to sell redeemed cotton for a sufficient amount to satisfy CCC's secured claim in full. CCC is not entitled to any profit realized by the Trustee; however, in the event of a deficiency CCC would have a claim against the Trustee as a recourse CCC–813 buyer. If the Trustee is unable to sell specific cotton for a sufficient amount to satisfy CCC's secured claim, the Trustee should promptly abandon that collateral to CCC, unless the parties agree otherwise. CCC's interest in the cotton collateral is adequately protected, and CCC is not entitled, at this time, to relief from the automatic stay which remains in effect so as to prevent either election or other foreclosure action by CCC. Upon a sale by the Trustee, if there is a dispute over satisfaction of CCC's secured claims or the amount of such claims, the sale proceeds shall be escrowed in a separate interest bearing account pending the Court's determination of such issues as are then presented.

SO ORDERED.