**STATE OF MONTANA,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant–
Appellee.**

No. 95–5123.

United States Court of Appeals,
Federal Circuit.

Aug. 27, 1997.

Nancy Bennett, Moulton, Bellingham, Longo & Mather, P.C., Billings, MT, argued for plaintiff-appellant. With her on the brief was Sidney R. Thomas.

Laureen Kapin, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Assistant Director.

Before PLAGER, Circuit Judge, SMITH, Senior Circuit Judge, and LOURIE, Circuit Judge.

EDWARD S. SMITH, Senior Circuit Judge.

### Decision

The State of Montana appeals the decision of the United States Court of Federal Claims' granting summary judgment for the United States and finding that Montana was not an intended third-party beneficiary of a contract between the government and Great Western Sugar Company's bankruptcy creditors. Because we find that federal law mandates a priority for the United States' claim over Montana's claim, the judgment of the Court of Federal Claims is affirmed.

### Facts [1]

Great Western Sugar Company ("Great Western") was in the business of processing sugar beets and marketing the refined sugar with corporate headquarters in Dallas, Texas and operational headquarters in Denver, Colorado. Great Western operated sugar processing facilities in several states, including a

---

1. In this appeal from a grant of summary judgment, all facts are construed in favor of Montana, the non-movant. *See Union Pac. Corp. v. United States,* 5 F.3d 523, 525 (Fed.Cir.1993).

factory in Billings, Montana. As a Montana employer, Great Western was subject to the dictates of the Montana Workers' Compensation Act ("Montana Act"). Pursuant to the Montana Act, Great Western elected to self-insure its workers' compensation risk. The Montana Act provides for an automatic lien against a self-insuring corporation's assets if the corporation does not meet its workers' compensation obligations.[2]

Between October of 1984 and January of 1985 Great Western received three price support loans from the Commodity Credit Corporation ("CCC") for its 1984–1985 refined sugar production. The parties executed four security agreements pertaining to the refined beet sugar that would serve as collateral to secure the loans. CCC filed a financing statement with the state of Montana on October 24, 1984.

Congress created CCC under the Commodity Credit Corporation Charter Act ("Charter Act"). 15 U.S.C. § 714 *et seq.* CCC is an agency of the United States subject to the general supervision and direction of the Secretary of Agriculture. Pursuant to the Agricultural Act of 1949, as amended, 7 U.S.C. § 1421, *et seq.*, CCC supports farm prices by providing nonrecourse loans to producers or farmers of agricultural commodities. Due to the perishable nature of sugar beets, CCC provides the loans to the sugar processors and not the sugar beet farmers. The processors then pay the sugar beet growers a minimum price for their crop and pledge the refined sugar as loan collateral. 7 C.F.R. §§ 1435.37(b), 1435.38 (1983).

The regulations governing the 1983 through 1985 sugar price support loan program required CCC to obtain waivers of liens or encumbrances on the sugar that Great Western pledged as loan collateral, in order to "protect fully the interest of CCC." 7 C.F.R. § 1435.121(d) (1983). In lieu of a lien waiver, CCC could accept a lienholder's subordination agreement giving CCC's claim priority. The regulations prohibited Great Western from encumbering the sugar collateral after CCC approved the loan. 7 C.F.R. § 1435.121(d) (1983). The processor was required to warrant that he had a legal right to grant CCC a first lien on the sugar.

In February of 1985 Great Western's financial situation had deteriorated to the point that its bank refused to honor its checks. A number of checks to Great Western's employees and former employees for benefits under the Montana Act were returned for insufficient funds. On March 7, 1985, Great Western filed a petition in bankruptcy under Chapter 11 in the United States District Court for the Northern District of Texas. The bankruptcy court authorized the sale of a portion of Great Western's assets, approximately 1,415,654 CWT[3] of refined sugar, including approximately 157,000 CWT located in Montana, to a company known as Tate & Lyle, "free and clear of any mortgage, pledge, claim, lien, encumbrance, security interest, or other rights of any kind to any entity." The proceeds of the sale to Tate & Lyle ("sugar proceeds") became part of the bankruptcy estate. The sale of the Montana portion of the sugar accounted for $3,182,390 of the sugar proceeds.

The State of Montana, as trustee for the uncompensated injured workers, a group of bank lenders, and CCC all asserted first liens on the sugar proceeds. In December of 1985 the bankruptcy court approved a compromise settlement agreement between Great Western, the bank lenders and CCC. Under the settlement agreement, the bank lenders agreed that CCC had a superior lien against the sugar proceeds, and the parties agreed to satisfy CCC's liens from the sugar proceeds.

---

**2.** The Act provides, in pertinent part:

In case of bankruptcy, insolvency, liquidation, or the failure of an employer or insurer to meet any obligations imposed by this chapter, every liability which may be due under this chapter shall constitute a first lien upon any deposit made by such employer or insurer, and if such deposit shall not be sufficient to secure the payment of such liability in the manner and at the times provided for in this chapter, the deficiency shall be a lien upon all the property of such employer or insurer within this state and shall be prorated with other lienable claims and shall have preference over the claim of any creditor or creditors of such employer or insurer except the claims of other lienors.
Mont.Code Ann. § 39–71–408.

**3.** One CWT is equal to one hundred pounds.

In exchange, CCC agreed (1) to release its claims against Great Western's assets, (2) to indemnify the bank lenders from any claims against the sugar proceeds, and (3) that the bank lenders should receive the non-sugar proceeds. As a result, CCC received $28,136,427.47 plus interest.

In the settlement agreement, CCC acknowledged:

> (i) [T]hat upon implementation of this Comprehensive Settlement Agreement, the CCC may be subject to the claims of third parties and (ii) that other parties have asserted claims on [the sugar proceeds], which claims may be found to be superior or equal to the CCC liens and accordingly, the CCC agrees that it is subject to claims and obligations with respect to the CCC Sugar Proceeds ... whether such claims are asserted by such other parties or by the Bank Lenders by way of indemnity or contribution.

Neither the settlement agreement nor the bankruptcy court's order approving the settlement resolved Montana's claim for workers' compensation benefits.

In 1987, Montana entered into a court-approved settlement agreement with Great Western and the bank lenders. In return for $100,000, Montana released its claims against Great Western and the bank lenders and expressly reserved its right to pursue claims against CCC.[4]

Great Western's injured workers sued Montana for unpaid benefits. *See State ex rel. Div. of Workers Compensation v. District Court,* 246 Mont. 225, 805 P.2d 1272 (1990). In 1992, Montana settled with eighteen injured workers for a total of $667,759.53. Montana took an assignment of the injured workers' rights against both Great Western and CCC.

*Procedure*

On July 18, 1994, Montana filed an amended complaint with the Court of Federal Claims[5] seeking: (1) monetary damages of $667,759.63, plus interest, for breach of a third-party beneficiary contract—the settlement agreement between CCC and the bank lenders, (2) imposition of constructive trust under Montana state law, and (3) a declaratory judgment that Montana's lien was superior to the government's liens. Montana proceeded on the theory that Great Western's workers' compensation deficiency became a lien upon Great Western's property in the state and this lien was superior or equal to CCC's liens. *See Montana v. United States,* 33 Fed. Cl. 82 (1995)("*Montana I* ").

On September 2, 1994, the United States filed a motion to dismiss all three counts of Montana's complaint. The Court of Federal Claims granted the United States' motion as to counts 2 and 3, citing a lack of jurisdiction because the court has no power to order specific enforcement or grant equitable or declaratory relief. *See Montana I,* 33 Fed. Cl. at 88. The court found that while the agreement appeared on its face to be a third-party beneficiary contract for the benefit of creditors whose claims against Great Western were higher priority than CCC's claim, the plaintiff had not stated a claim to be such a creditor and directed Montana to show cause why count 1 should not also be dismissed. *See id.*

In briefs and oral argument on the issue, CCC argued that the court lacked jurisdiction because the agreement is not a third-party beneficiary contract. Further, the government argued, if the contract is construed to be a third-party beneficiary contract, the contract does not bind the government because CCC lacked authority to enter into such an agreement. The Court of Fed-

---

**4.** Although Montana filed a proof of claim arising from Great Western's workers' compensation liability, it apparently did not contest the bankruptcy court's approval of the 1985 settlement between Great Western, the bank lenders and CCC.

**5.** Initially, Montana filed suit against the United States and CCC in the United States District Court for the District of Montana claiming conversion. The district court held that it lacked

jurisdiction to entertain Montana's complaint because the United States Court of Federal Claims had exclusive jurisdiction over the claims pursuant to the Tucker Act, 28 U.S.C. § 1491. The court found that the refusal to pay the debt did not constitute a claim for conversion but an action for breach of contract and transferred the case to the Court of Federal Claims pursuant to 28 U.S.C. § 1631.

eral Claims granted summary judgment for the United States and dismissed Montana's complaint, holding that Montana was not an intended beneficiary of the settlement agreement because Montana's lien was not superior or equal to CCC's claim. *See Montana v. United States,* 33 Fed. Cl. 433, 437 (1995)("Montana II").

The court found that Montana's lien was lesser in priority to CCC's, reasoning that the statutes and regulations governing the sugar loan program contained a congressional directive mandating a super-priority for CCC's claims. Alternatively, the Court of Federal Claims held that if Montana state law controlled, CCC's claims took priority over Montana's lien. *Montana II,* 33 Fed. Cl. at 436, 437.

Finally, the Court of Federal Claims held that even if Montana's lien were found to be equal or superior to CCC's security interest, CCC's settlement agreement with the bank lenders was invalid. The court reasoned that the agreement was invalid because the CCC official who signed the agreement did not have authority to enter into an agreement that did not fully protect the interests of CCC. Montana appeals the grant of summary judgment on the third-party beneficiary claim.

*Jurisdiction and Standard of Review*

 This court exercises jurisdiction over an appeal of summary judgment by the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3). This court employs complete and independent review over an appeal of the propriety of summary judgment, construing the facts in a light most favorable to the non-movant. Summary judgment is appropriate only when the movant has established that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *See Cohen v. United States,* 995 F.2d 205, 207 (Fed.Cir.1993); *Doyle v. United States,* 931 F.2d 1546, 1549 (Fed.Cir.1991).

*Third-Party Beneficiary Status*

 The parties disagree as to the test to be applied in determining third-party beneficiary status. Indeed, there have been conflicting decisions in the Court of Federal Claims as to the proper test to determine when a party can be considered an intended third-party beneficiary. In *Baudier Marine Electronics v. United States,* 6 Cl.Ct. 246, 249 (1984), the Claims Court enunciated a two-part test: (1) the contract must reflect the intent to benefit the third-party, and (2) the contract must give the third-party the direct right to compensation or to enforce that right against the promisor. In *Schuerman v. United States,* 30 Fed. Cl. 420 (1994), the Court of Federal Claims analyzed the court's reasoning behind the two-part test of *Baudier* and concluded that no authority existed for employing the second prong of the test in most cases. This court agrees with the Court of Federal Claims' determination in *Schuerman* that the appropriate test for intended third-party beneficiary status includes only the first prong of the *Baudier* test, that the contract must "reflect[ ] the express or implied intention of the parties to benefit the third-party." *Schuerman,* 30 Fed. Cl. at 433.[6]

 The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby. One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him. *See* Restatement (Second) of Contracts § 302(1)(b) cmt. d.[7]

---

**6.** This court does not foreclose application of the second prong of the *Baudier* test when members of the public bring suit against promisors who contract with the government to render a public service. In this situation, members of the public are considered to be incidental beneficiaries unless they can show a direct right to compensation. *See Schuerman,* 30 Fed. Cl. at 430; *H.F Allen Orchards v. United States,* 4 Cl.Ct. 601

(1984). *See also National Surety Corp. v. United States,* 31 Fed. Cl. 565, 575 (1994).

**7.** Section 302 states, in pertinent part:
 (1) Unless otherwise agreed between promisor and promissee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and
 . . .

To determine whether Montana is an intended third-party beneficiary, therefore, this court must ask if Montana could have reasonably relied on CCC's promise to pay off superior claims as manifesting rights in Montana. The Court of Federal Claims was correct in determining that Montana could only have reasonably relied on CCC's promise to honor the claim of a senior lienholder if its lien is of equal or greater priority than CCC's.

### Federal Preemption

■ In *Clearfield Trust Co. v. United States,* the Supreme Court found that in cases where the rights and duties of the United States find their roots in federal sources, a federal court is not bound by *Erie* to apply state law. *Clearfield Trust,* 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943)(referring to *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The *Clearfield Trust* Court reasoned that "[w]hen the United States disburses its funds or pays its debts, it is exercising a constitutional function or power.... The authority to issue [such funds] ha[s] its origin in the Constitution and the statutes of the United States and [is] no way dependent on the laws of ... any ... state." *Id.*

In *United States v. Kimbell Foods, Inc.,* the Court debated whether state or federal law applied to the lien priority disputes between federal lending agencies and private claimants. *Kimbell Foods,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). Applying the *Clearfield Trust* reasoning, the Court found that historically it had "consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal lending programs." *Id.* at 726, 99 S.Ct. at 1457. Noting the significant federal interest involved in protecting federal lending programs, the *Kimbell* court found that the "[p]riority of

liens stemming from [such] programs must be determined with reference to federal law." *Id.*

As CCC is a federal administrative agency congressionally authorized to implement a federal lending program, *Clearfield Trust* and *Kimbell Foods* require that federal law preempt state law and govern this case. We now must turn to the more difficult task of giving content to the federal rule.

### Applicable Rule of Law

■■ The *Clearfield Trust* Court directed that "[i]n absence of an applicable act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." *Clearfield Trust,* 318 U.S. at 367, 63 S.Ct. at 575. The *Kimbell Foods* court elaborated on the test to be applied. First, the court must determine if federal statutes provide a rule of priority. If they do, then that rule must be applied. If the statutes are silent, however, the federal courts must "fill the interstices of federal legislation 'according to their own standards.'" *Kimbell Foods,* 440 U.S. at 727, 99 S.Ct. at 1457. Therefore, if no federal statute supplies the rule of law, the court must determine whether to create federal common law or to incorporate state law as the rule of decision.[8]

### Federal Statutes Provide the Rule for Priority in this Case

■ First, we must ask whether federal statutes supply a rule of decision in this case. The United States argues that 15 U.S.C. § 714b(g) and 7 C.F.R. § 1435.121(d), taken together, set forth a clear congressional directive governing priority disputes under the sugar loan program. The United States reasons that although the Charter Act itself does not directly address the priority of CCC-held liens, it does provide that CCC

---

(b) The circumstances indicate that the promisor intends to give the beneficiary the benefit of the promised performance.
Restatement (Second) of Contracts § 302(1)(b) cmt. d.

8. The *Kimbell Foods* Court considered three factors in determining whether to create federal common law or to incorporate state law as the

rule of decision: (1) the need for national uniformity, (2) whether state law would "frustrate specific objectives" of the federal program; and (3) the extent to which federal rules might "disrupt commercial relationships predicated upon state law." *Kimbell Foods,* 440 U.S. at 728–29, 99 S.Ct. at 1458–59

regulations and contractual provisions preempt conflicting state principles. They argue that the regulatory and contractual provisions of the sugar price support program at issue here establish that a lien held by CCC is superior to any later-acquired liens and that this rule, when viewed in connection with the Charter Act, establishes a legislative scheme which controls the lien priority dispute in this case that must govern.

The statute which outlines the general powers of CCC provides that CCC:

> [m]ay enter into and carry out such contracts or agreements as are necessary in the conduct of its business ... State and local regulatory laws or rules shall not be applicable with respect to contracts or agreements of the Corporation or the parties thereto to the extent that such contracts or agreements provide that such laws or rules shall not be applicable, or to the extent that such laws or rules are inconsistent with such contracts or agreements.

15 U.S.C. § 714b(g).

The regulations which were applicable to price support loans for the 1983 through 1985 sugar beet crops provided that:

> Waivers of liens or encumbrances on the sugar pledged as loan security to CCC must be obtained to protect fully the interest of CCC. A lienholder, in lieu of waiving a prior lien on sugar, may execute with CCC a Lienholder's Subordination Agreement ... in which the lienholder's security interest is subordinated to the rights of CCC. No liens or encumbrances shall be placed on the sugar pledged as collateral after the loan is approved.

7 C.F.R. § 1435.121(d)(1984). This regulatory provision was expressly included in the contracts between CCC and Great Western.[9]

As quoted above, the Charter Act provides that "state and local regulatory laws or rules shall not be applicable with respect to contracts or agreements of the Corporation ... to the extent that such laws or rules are

inconsistent with such contracts or agreements." 15 U.S.C. § 714b(g). The regulatory and contractual provisions establish that a fundamental tenet of the sugar price support program is that CCC be "fully protected" against other liens on the sugar. For this reason, Section 1435.121, as incorporated into the security agreement, mandates that any superior lienholder waive or subordinate their liens and that "[n]o liens or encumbrances shall be placed on the sugar pledged as collateral after the loan is approved." 7 C.F.R. § 1435.121. When these provisions are viewed together, Montana cannot assert that Montana state commercial law provides that Montana's later-acquired lien is superior to CCC's lien because this result would be inconsistent with both the regulations governing the sugar price support program and the provisions of CCC's security agreements.

This interpretation of the Charter Act and applicable regulations is supported by the Sixth Circuit's decision in *Buckeye Sugars, Inc. v. Commodity Credit Corp.*, 744 F.2d 1240 (6th Cir.1984). In *Buckeye*, the sugar processor entered into a loan agreement with CCC, allowing the processor the option of repaying the loan or surrendering the sugar collateral to CCC when the loan came due. If the processor chose the latter option, the agreement stipulated that CCC did not need to account for excess proceeds upon the sale of the sugar collateral. The processor chose to deliver the sugar to CCC rather than repay the loan and CCC sold the sugar for more than the loan amount.

In a suit to recover the excess proceeds, the processor asserted that state law, which required an accounting, governed the transaction. The court rejected this argument, relying on 15 U.S.C. § 714b(g) to find that the statutory scheme set forth in the Charter Act mandated a federal rule of priority, and finding that a state law, such as a state's version of the U.C.C., is inapplicable to CCC transactions to the extent that it conflicts with the terms of CCC loan contracts. *Buckeye*, 744 F.2d at 1244.

---

9. The November 16, 1984 Farm Storage Note and Security Agreement between Great Western and CCC provides that "[t]he producer represents and warrants that ... (v) the collateral commodity is free and clear of all liens, security interests, and encumbrances, including landlord's liens except in favor of the lienholder from whom waivers have been secured."

To rebut this argument, Montana cites as authority *Commodity Credit Corp. v. Scottsbluff Nat'l Bank & Trust,* No. 35–3581 (Bankr.N.D.Tex.1986), *aff'd, United States v. Scottsbluff National Bank & Trust Co.,* 902 F.2d 351 (5th Cir.1990). The *Scottsbluff* case also arose out of the Great Western bankruptcy. In *Scottsbluff,* the individual sugar beet farmers obtained loans from Nebraska banks to cover the expenses of growing their crops, pledging the sugar beets as collateral. The same farmers contracted with Great Western, for many the only sugar beet purchaser available, to sell their entire crops. The banks perfected the security interests in the sugar beets, products of the sugar beets, and proceeds.

Great Western then procured loans from CCC, asserting that the sugar was clear of prior liens, and CCC perfected a security interest in Great Western's refined sugar. If CCC had conducted a thorough search, they would have discovered the banks' liens on the farmers' sugar beets. After Great Western filed for bankruptcy and the bankruptcy court ordered the sale to Tate & Lyle, both creditors, the banks and CCC, claimed priority to the proceeds from the sale. The bankruptcy court applied the three-part test of *Kimbell,* incorporated state law as the federal rule of decision, and ruled that the banks' claims to the sugar were superior to those of CCC.[10]

The *Scottsbluff* case is distinguishable from the instant case in that, in *Scottsbluff,* the banks' liens were perfected *prior* to the time the loan agreements with CCC were executed and CCC could have discovered the bank liens with a thorough search. As discussed above, the regulation that establishes priority for CCC in this case mandates that "[n]o liens or encumbrances shall be placed on the sugar pledged as collateral *after the loan is approved.*" 15 C.F.R. § 1435.121 (emphasis added).

Montana further asserts that *Buckeye* is distinguishable and § 714b(g) does not apply, because Montana was not a party to the security agreement between Great Western

and CCC. The plain language of the statute does not support such a reading. The statute provides that state law shall not apply to "contracts or agreements of the Corporation or the parties thereto." 15 U.S.C. § 714b(g). State law is therefore not applicable to the contracts of CCC or, in the alternative, to the parties to such contracts. *See Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252–53, 114 S.Ct. 2239, 2244–45, 129 L.Ed.2d 203 (1994)("or" means "in the alternative"). This statute is clearly applicable to the contract between CCC and Great Western under which Montana seeks relief.

*Conclusion*

We find that the regulations and contractual provisions promulgated by CCC, in conjunction with the Charter Act, which provides that state law cannot be applied where it conflicts with such provisions, provide a comprehensive scheme for federal lien priority. Because we find that the statutes provide the rule of law, we need not engage in the three-part *Kimbell* analysis to determine the content of the law.

 Because the rule of law mandates that CCC's lien have priority over Montana's lien, Montana is not adjudged to be a third-party beneficiary of the contract between Great Western and CCC.

For these reasons, the Court of Federal Claims' grant of summary judgment dismissing Montana's third-party beneficiary claims is

*AFFIRMED.*

---

**10.** The incorporation of state law as the federal rule of decision in this case was not appealed to

or considered by the Fifth Circuit.