James M. SALLEE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–629C.

United States Court of Federal Claims.

July 28, 1998.

Richard E. Miley, Augusta, SC, for plaintiff.

Thomas A. Coulter, Washington, DC, with whom was Assistant Attorney General Frank Hunger, for defendant.

## ORDER

MILLER, Judge.

This matter is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment pursuant to RCFC 56. The issue to be decided is whether plaintiff is a third-party beneficiary to a contract between the Department of Energy and his former employer, such that plaintiff is entitled to an incentive fee award resulting from his submission of a cost reduction proposal. Argument is deemed unnecessary.

## FACTS

No facts material to resolution of this case are in dispute. James M. Sallee ("plaintiff") formerly was employed as an engineer by Westinghouse Savannah River Company (the "WSRC"), a wholly owned subsidiary of Westinghouse Electric Corporation (now CBS corporation). In 1988 WSRC signed Management and Operations Contract No. DE–AC09–89SR18035 (the "M & O" contract) with the Department of Energy ("DOE") to manage and operate the Savannah River Site ("SRS"), a nuclear defense facility located in South Carolina. From

April 1, 1989, until September 30, 1996, WSRC performed the M & O contract acting as the primary management and operating contractor at SRS.

In 1992 DOE established a Cost Reduction Proposal program ("CRP program") with WSRC. The CRP program was added to the DOE/WSRC contract in Modification 068 as section H.29, entitled "Cost Reduction Proposal."[1] The CRP program became effective on October 1, 1992, for a one-year trial period. The program attempted to entice contractors and employees into suggesting cost reducing proposals ("CRPs") to DOE by offering them financial incentives. Under the CRP program, if DOE determined that the proposal satisfied the program requirements, WSRC would receive an incentive bonus of up to 25% of the savings achieved by implementing the proposal. The contract also required WSRC to reserve a minimum of 10% of the incentive bonus for payment to the particular employee(s) responsible for the cost-savings proposal. Under the CRP program, WSRC had sole authority to submit any such proposals to DOE, which then had absolute discretion to approve or disapprove the cost reduction proposals.

Modification 103 ("Ml03"), although not executed until November 4, 1994, modified the last sentence of section B ¶ B.2.b of Modification 068 by lengthening the initial time period of the CRP program from one to two years, ending on September 30, 1994. Modification 116 ("M116"), effective on October 1, 1994, extended the hard dollar savings program from October 1, 1994, to the end of the contract period, September 30, 1996. M116 also revised section H.29, the Cost Reduction Proposals provision, to provide: "[A] fee shall be paid to the Contractor for demonstrable 'hard dollar' cost savings identified by the Contractor and accepted by the Government in accordance with the provisions of Section H.29 Cost Reduction proposals." Under revised section H.29, contractors agreed to "examine and make one-time and continuing improvements in the cost of their contract operations and return 'saved' funds to the direct control of DOE." The contractor further agreed that "[t]hese funds shall be placed into the contractor's Management Reserve[2] and available for deobligation by the [DOE]. . . ."

Subsequent modifications to the CRP program did not alter the program's basic requirements. First, the proposals must have produced hard dollar savings:

"Hard Dollar Savings" . . . means savings resulting from the application of an accepted CRP to this contract. Hard Dollar Savings shall be limited, for purposes of the sharing rate(s) . . . to twenty-four months. In order to qualify for sharing, savings must be susceptible to being deobligated from the instant contract, whether or not such deobligation takes place.

Second, each CRP submitted by WSRC must have included a description of the existing method contrasted with the proposed new practice/method; a description of the changes that must be made if the CRP were accepted, including changes or waivers to design or regulatory requirements; and a separate detailed costs estimate for the existing baseline cost requirements[3] and the CRP. The costs estimate for the CRP must have accounted for the costs of implementing the CRP, including those incurred by DOE.

The CRP submission procedures required the submitted proposal to document "that claimed savings in the Cost Reduction Pro-

---

1. Modification 068 mandates that a CRP proposal produce hard dollar savings, which occur

   when a proposal demonstrates that funds previously allocated to or budgeted for an existing baseline can be deobligated and returned to a management reserve account, thereby giving DOE discretionary control over the deobligated funds. To qualify for sharing, savings must be susceptible to being deobligated from the instant contract, whether or not such deobligation takes place. (Up to 24 months from the date of implementation.)

2. Management Reserve is a financial reserve funding account established by the contractor and controlled by SRS. These funds must be available for deobligation by the DOE or available for other uses through the written approval of DOE–SRS.

3. Baseline Costs means the cost of performing the necessary operation using existing methods, including labor and materials. Costs must be authorized and included in approved site budgets.

posal have been transferred to a management reserve account controlled by DOE–SR prior to submission of the proposal to the DOE ... [Incentive Program] Administrator." In addition, the CRP program gave WSRC sole rights to an employee's proposals and sole discretion to determine whether a proposal would be submitted to DOE. The program also precluded a WSRC employee from challenging, through litigation, a DOE decision concerning a proposal, and section H.29(j) exempted DOE decisions on CRPs from litigation arising from the disputes clause of the contract and the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–13 (1994), *as amended by* 41 U.S.C.A. §§ 601–613 (West Supp.1998) (the "CDA").

In the Cost Reduction Incentive Program Manual (the "Incentive Program Manual"), DOE established policies and procedures for the submission of CRPs. The Incentive Program Manual reiterates the same definitions and requirements that are stated in the DOE/WSRC contract, namely that CRPs achieve hard dollar savings, that those savings be held in a management reserve account, and that a contracting officer has the final approval on submitted CRPs and those decisions are not subject to the CDA. The Incentive Program Manual also provides the following definition of soft dollar savings: "Soft Dollar Savings (Cost Avoidance): 'Efficiency/productivity improvements' eliminating duplication of effort, material and facilities as well as inefficient processes resulting in increased program output for the same level of staffing, materials or services and may not result in returning actual funds to DOE control."

In implementing the CRP program, WSRC devised its own program manual for developing and presenting CRPs to DOE entitled "Quality Improvement Suggestion System [ ("QISS") ] and Creating Customer Value Program [ ("CCV") ]." The WSRC manual restates the general rules of the CRP program with definitions of hard dollar savings, management savings account, and soft dollar savings. The section entitled "Existing Baseline Cost" on the CCV form states that only costs previously included in authorized or approved site budgets will result in

Hard Dollar Savings. Furthermore, all proposals must be signed and must include the following statement: "I understand and agree to abide by the rules of QISS and CCV programs."

Additionally, the DOE/WSRC contract, the Incentive Program Manual, and the WSRC manual all state that WSRC owns CRPs submitted to the company, regardless of DOE approval. As a condition of his employment with WSRC, on June 6, 1989, plaintiff executed an Employee Intellectual Property Agreement, whereby he assigned to WSRC his rights to any intellectual property made, conceived, or authored by him that related to his employment. The agreement was applicable throughout the duration of plaintiff's employment.

On June 14, 1994, plaintiff submitted to WSRC a CRP in the form of a Disposal Plan for Powerhouses, which identified and proposed a plan for the disposal of certain surplus powerhouses and a heavy-water facility at SRS that had as its goal cost avoidance. Plaintiff's plan involved selling these powerhouses "as is" and "where is" to the highest bidder; the purchaser would then be responsible for the cost to decommission and demolish the facilities. Despite DOE's lack of success with similar proposals in the past, plaintiff distinguished his CRP by making the purchaser responsible for the decommissioning and demolition of the sites. Previous proposals made DOE responsible for the dismantlement and demolition costs. Plaintiff claims that his proposal would create an estimated savings of $9,025,199.00 with payments of $759,150.00 to DOE. As required by the CRP program, plaintiff certified that he understood and agreed to abide by the rules of the WSRC QISS and CCV programs before WSRC submitted his proposal to DOE.

On June 28, 1996, WSRC submitted plaintiff's proposal to DOE under the CRP program provisions of the modified M & O contract. In August 1996 DOE evaluated and rejected plaintiff's proposal for failing to meet certain program requirements. According to several documents produced during this review, plaintiff's proposal was noncompliant because it outlined a pre-existing

site practice and failed to result in the deobligation of any funds to the management reserve. In other words, because no funds actually had been obligated for plaintiff's CRP proposal, his proposal could not achieve hard dollar savings, as required by section H.29(c)(4), although it may have generated soft dollar savings. DOE did not share any savings with WSRC resulting from the use of plaintiff's CRP proposal in the fiscal years 1996, 1997, or 1998. WSRC thus was not obligated to award any funds, as an incentive bonus, to plaintiff under the CRP program.

On May 1, 1997, plaintiff's attorney sent a letter to L.C. Sjostrom, who was not the contracting officer, but merely a participant in the review of plaintiff's proposal, requesting reconsideration of plaintiff's CRP proposal. The letter also strongly urged DOE to consider a future relationship with plaintiff for the disposal of additional site facilities in accordance with plaintiff's rejected CRP proposal.

Plaintiff charges that, in rejecting his CRP application under the standards of M116, the contracting officer acted arbitrarily and capriciously by failing to apply the standards set forth in the M & O contract and that DOE breached an implied covenant of good faith and fair dealing in failing to give fair consideration to plaintiff's application. Plaintiff claims entitlement to a minimum of 10% of the $2,250,000.00 cost-reduction fee, which totals $225,000.00.

## DISCUSSION

### 1. *Privity of contract requirement*

"All Federal Courts are courts of limited jurisdiction, and it is the duty of a federal court to examine its jurisdiction over every claim before it assumes jurisdiction over the claim." *RHI Holdings v. United States,* 142 F.3d 1459, 1461 (Fed.Cir.1998). The jurisdictional limits of the Court of Federal Claims are set by the Tucker Act, 28 U.S.C.A. § 1491(a)(1) (West Supp.1998), which authorizes jurisdiction over any claim against the United States founded upon an express or implied in fact contract. However, the Tucker Act does not create a substantive cause of action. *See United States v.*

*Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). If the court determines that jurisdiction is lacking as a matter of law, dismissal is required. *See Thoen v. United States,* 765 F.2d 1110, 1116 (Fed.Cir.1985).

The jurisdiction of the Court of Federal Claims is further created by waivers of sovereign immunity by the United States through acts of Congress. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Testan,* 424 U.S. at 399, 96 S.Ct. 948. The Tucker Act authorizes the Court of Federal Claims to assume jurisdiction over certain suits against the sovereign. 28 U.S.C. § 1491. Any waiver of sovereign immunity must be expressed explicitly by Congress, *Testan,* 424 U.S. at 399, 96 S.Ct. 948, and must be construed strictly. *See Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349. Therefore, no jurisdiction exists in this court absent a waiver of sovereign immunity by the United States. *See id.; Testan,* 424 U.S. at 399, 96 S.Ct. 948. "If the United States did not intend to allow a contract action against it by an entity that is not a party to the contract, then it can be argued that the United States never waived sovereign immunity so as to authorize such a suit." *Restatement (Second) of Contracts* § 302 (1981).

Establishing jurisdiction under the Tucker Act requires that a litigant possess privity of contract, specifically encompassing a contractual relationship between itself and the government. *See Erickson,* 731 F.2d at 813; *Maniere v. United States,* 31 Fed.Cl. 410, 416 (1994). Privity of contract is "an undisputed prerequisite for standing to sue in the Court of Federal Claims under the Tucker Act." *National Leased Housing Ass'n v. United States,* 105 F.3d 1423, 1435 (Fed.Cir.1997). To have a viable claim, plaintiff must be able to establish privity of contract with the government or a contractual relationship with the government as a third-party beneficiary.

Plaintiff asserts privity of contract based on language contained in the DOE/WSRC contract and the Incentive Program Manual that requires the contractor to award at least 10% of the shared savings to the employees responsible for the CRP. Plain-

tiff cites the Incentive Program Manual, which states: "M & O contractors are required to distribute at least 10% of their share of the savings to the onsite/personnel/organization which identified the cost reduction proposal."[4] This passage merely directs WSRC to award a percentage of any shared savings to the employees responsible for the submitted CRP, once it is approved by DOE. Awarding employee incentive fees was explicitly left to WSRC. Therefore, DOE and WSRC are the only parties to the contract, and plaintiff's status as an employee of WSRC does not confer the necessary privity of contract with the Government. Because plaintiff lacks privity with the United States, he must present alternative grounds for jurisdiction, such as being a third-party beneficiary to the DOE/WSRC contract.

### 2. Third-party beneficiary status

To avoid the privity requirement and demonstrate jurisdiction, plaintiff contends that he is a third-party beneficiary to the DOE/WSRC contract.[5] Plaintiff bases his claim for third-party beneficiary status on language contained in the DOE/WSRC contract that allegedly demonstrates an intention by DOE to reward WSRC employees for DOE-approved CRP proposals. Plaintiff relies on the same language to support his third-party beneficiary status as he did to support privity of contract between the Government and himself.

**■** In order for plaintiff to have a viable third-party beneficiary claim, he must demonstrate that he is an intended third-party beneficiary, as evidenced by the intent or words of the DOE/WSRC contract. See *Montana v. United States*, 124 F.3d 1269, 1273 & n. 6 (Fed.Cir.1997) (adopting the third-party beneficiary test set forth in *Schuerman v. United States*, 30 Fed.Cl. 420, 433 (1994)).[6] Any such intent is found through an examination of the parties' entire contractual relationship, see *Schuerman*, 30 Fed.Cl. at 425, 433, and is ascertained by determining whether the beneficiary would be reasonable in relying on the promise as intending to confer a right on him. See *Montana*, 124 F.3d at 1273.

**■** Plaintiff relies on an isolated passage of the DOE/WSRC contract as the sole indication of the parties' intent to make himself and other employees of WSRC third-party beneficiaries to the DOE/WSRC contract. He points to language in the CRP clause that allegedly demonstrates that employees could benefit financially if DOE approved their CRP proposals. A third-party beneficiary need not be specifically or individually identified in the contract, but must fall within a class that the contract clearly intends to benefit. See *Montana*, 124 F.3d at 1273. However, in examining the contractual relationship between DOE and WSRC as a whole, it is apparent that the contractual relationship with WSRC was structured such that WSRC

---

**4.** Similar language can be found in M068, the standard under which plaintiff claims his CRP should have been analyzed: "The contractor agrees that not less than 10% of the contractor's share of savings shall be retained at the site to be distributed to those employees involved in the identifying and/or achieving the causal cost relationship."

**5.** Section 302 of the *Restatement (Second) of Contracts* defines third-party beneficiaries:

§ 302. Intended and Incidental Beneficiaries
(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

**6.** Prior to *Montana* the test to determine whether or not a third-party had standing to sue was two-pronged: (1) that the contracting parties intended to benefit directly the third party and, (2) that the contract reflects the intent to give the third party the direct right to compensation or to enforce that right against the promisor. See *Baudier Marine Elecs. v. United States*, 6 Cl.Ct. 246, 249 (1984), *aff'd*, 765 F.2d 163 (Fed.Cir.1985). *But see Schuerman*, 30 Fed.Cl. at 429 (rejecting second prong of *Baudier* test as inapplicable unless members of general public bring suit against promisors who contract with Government to render public service).

employees had no direct relationship with DOE.

■ Under the terms of the contract, and the regulations of the CRP program, WSRC was to submit CRPs, and only WSRC would be compensated if the proposal was approved by DOE. According to the Chief Financial Officer for the DOE Savannah Rivers Operation Office, "SR has never paid an employee directly for any CRP award." Declaration of John Pescolido, June 9, 1998, ¶ 4. DOE retained sole discretion to approve or disapprove CRP proposals and the contract explicitly foreclosed litigation arising from DOE's decisions on proposals. No documents or presented facts indicate that plaintiff or any class of WSRC employees were the intended or implied beneficiaries of the DOE/WSRC contract. In contrast, the unambiguous language of the CRP program, Incentive Program Manual, and WSRC's manual could not lead a reasonable person to believe that the DOE/WSRC contract was conferring a right upon plaintiff. *See Montana*, 124 F.3d at 1273. Plaintiff is not an express or implied third-party beneficiary, but merely an incidental beneficiary[7] to the DOE/WSRC contract. Accordingly, plaintiff fails to establish a relationship that would cure his lack of privity with the Government.

### 3. *Alternative jurisdiction under the CDA*

Plaintiff asserts alternative jurisdiction under the CDA, alleging that the "notwithstanding" clause of section 609 of the CDA prevents the preclusive effect of his Employee Intellectual Property Agreement and the restrictions against filing suit contained in the DOE/WSRC contract, Incentive Program Manual, and WSRC's manual. Section 609(a)(1) provides that a claimant "may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 609(a)(1). However, plaintiff fails to satis-

fy even the basic jurisdictional prerequisites needed to file a claim under the CDA.

■■ To file a claim under the CDA, there must be "both a valid claim, ... and a contracting officer's [final] decision on that claim." *J & E Salvage Co. v. United States*, 37 Fed.Cl. 256, 260 (1997), *aff'd*, 1998 WL 133265 (Fed.Cir.1998) (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed.Cir.1996)). A valid claim must satisfy three requirements: "It must be: (1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain." *James M. Ellett Constr.*, 93 F.3d at 1542. Plaintiff contends that either his CRP proposal or his May 1, 1997 letter to Mr. Sjostrom satisfies the requirements for a valid claim under the CDA. According to plaintiff, the letter and CRP are both written demands for the amount of shared savings he is owed under the DOE/WSRC contract.

■ Regardless of plaintiff's contentions, the CRP proposal does not qualify as a claim because it does not seek a sum certain as a matter of right. *See Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577 n. 7 (Fed.Cir.1995) (en banc). Both the Incentive Program Manual and WSRC's manual state specifically that DOE decisions are final with regard to whether proposals qualify for an incentive bonus and that those decisions cannot be appealed. Because DOE has sole discretion over CRP approval, plaintiff's CRP proposal cannot qualify as a claim that seeks a sum certain as a matter of right.

■ Alternatively, plaintiff contends that his May 1 letter to Mr. Sjostrom qualifies as a valid claim under the CDA. The May 1 letter merely asks for reconsideration of plaintiff's CRP proposal. Although the letter references plaintiff's entitlement to a percentage of the shared savings, it does not state a sum certain. In order to specify a sum certain, a claim must contain enough information so that the amount can be "determined by a simple mathematical calculation." *Hamza v. United States*, 31 Fed.Cl.

---

7. "Incidental beneficiary" means "a person who is neither the promisee of a contract nor the party to whom performance is to be rendered [but who] will derive a benefit from [the con-

tracts] performance." 2 S. Williston, *A Treatise on the Law of Contracts*, § 402 at 1099 (3d ed.1959); *see also Schuerman*, 30 Fed.Cl. at 431 & n. 10.

315, 322 (1994). Plaintiff claims that his proposal saved the Government over $9 million, but the information he supplied is inadequate because he gives no guidance as to the amount of money he claims he is owed. Moreover, the amount plaintiff is owed is contingent upon the amount of the incentive bonus that WSRC would have received from DOE.[8] In this instance DOE did not award WSRC an incentive bonus resulting from the use of plaintiff's CRP. Therefore, WSRC is not obligated to pay plaintiff for a CRP that was submitted, but not approved. By failing to submit a claim for a sum certain, plaintiff's May 1 letter fails to qualify as a claim under the CDA.

The CDA also requires that all claims be submitted to a contracting officer for a final decision. Plaintiff's May 1 letter was not sent to the contracting officer, but to Mr. Sjostrom, who merely participated in the review of plaintiff's CRP proposal. Even if the May 1 letter had been addressed to the contracting officer, it fails to request a final decision from which plaintiff can pursue any legal rights and does not mention the possibility of resorting to CDA procedures and remedies. Plaintiff's letter actually appears most concerned with establishing a future relationship with DOE. For all these reasons, plaintiff fails to invoke subject matter jurisdiction under the CDA.

Plaintiff claims that he is not a contractor, but a third-party beneficiary and thus he does not have to certify his claim. However, section 601(4) of the CDA states that third-party beneficiaries do not fall under the CDA definition of contractor. The definition of contractor contained in section 601(4) applies to the CDA in its entirety. If plaintiff is not a contractor for one requirement of the CDA, then he is not a contractor for any aspect of the statute.

Ultimately, plaintiff has no defense against his Employee Intellectual Property Agreement, in which his rights in his CRP proposal were assigned to WSRC, nor can he avoid the DOE and WSRC prohibitions against lawsuits regarding CRP determinations.[9]

### CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss is granted. The Clerk of the Court shall dismiss the complaint without prejudice for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

---

8. The sharing rate for the incentive bonus varied from proposal to proposal with a maximum of 25% of the savings paid to the contractor. Likewise the share of the incentive bonus that WSRC agreed to pay to the employee responsible for the cost savings varied with each proposal starting from a minimum of 10%.

9. Defendant cites plaintiff's noncompliance with the requirements of M116, and revised section H.29 as the basis for rejecting plaintiff's CRP.

Plaintiff counters that DOE should not apply Ml 16, but, rather, the standards, criteria, and definitions set forth in M068 as it was the modification in effect at the time of plaintiff's submission of his proposal to WSRC. However, M116, not M068 was in effect at the time WSRC submitted plaintiff's claim to DOE. DOE complied with the modified contract in effect at the time it conducted its review of plaintiff's CRP proposal.